**Mary Sue JANICSKO, Plaintiff,**

**v.**

**Scott PELLMAN, William G. Demmy, III, Jay Stoner, Mechanicsburg Police Department, the Borough of Mechanicsburg, Walter Katherman, Dr. Silvestre De La Cruz, Dr. Joanne Robertson, Ron Roberts and Holy Spirit Hospital of the Sisters of Christian Charity, Defendants.**

**Civ. A. No. 1:CV–90–1663.**

United States District Court, M.D. Pennsylvania.

Sept. 25, 1991.

332

Robert J. Mulderig, Carlisle, Pa., for plaintiff.

Edward E. Knauss, IV, Harrisburg, Pa., for defendants Borough of Mechanicsburg, Mechanicsburg Police Dept., Jay Stoner, William G. Demmy, III and Scott Pellman.

Daniel Lawrence Sullivan, Mette, Evans & Woodside, Harrisburg, Pa., for defendants Walter Katherman, Ron Roberts and Holy Spirit Hosp. of Sisters of Christian Charity.

Michael M. Badowski, Foulkrod, Reynolds & Havas, Evan Black, Harrisburg, Pa., for defendant Dr. Sylvestre De La Cruz.

Thomas B. Helbig, Joseph A. Quinn, Jr., Wilkes Barre, Pa., for defendant Dr. Joanne Robertson.

## MEMORANDUM

RAMBO, District Judge.

Before the court are the motions for summary judgment of four sets of defendants: 1) defendants William Demmy, III, Jay Stoner, Scott Pellman, Mechanicsburg Police Department and the Borough of Mechanicsburg (hereinafter referred to as the "Mechanicsburg defendants"); 2) defendant Joanne Robertson, M.D.; 3) defendant Silvestre De La Cruz, M.D.; and 4) Ron Roberts, Walter Katherman and the Holy Spirit Hospital of the Sisters of Christian Charity (hereinafter referred to as "Holy Spirit defendants"). These motions are ripe, and since they all concern the same essential facts, the court will address all four in one memorandum.

*Background*

This case presents a rather complex set of facts, many of which are indeed in dispute. In reciting the general background of the case, the court will attempt to rely on undisputed facts, but will, as necessary, fill in the gaps with the contested versions.[1] Occasionally, where appropriate,

1. Summary judgment standards, which will be discussed later in this memorandum, do not require that all facts be undisputed, only material facts. The court does not believe that the

the court will rely only on plaintiff's version of the facts as the court tests for an absence of evidence to prove her claims.

Some time early in the week of July 15, 1989, plaintiff Mary Sue Janicsko discovered that her husband was having an affair. The parents of three children ages 19, 17, and 12 at the time, the Janicskos had been married 20 years. The Janicskos also had two foster children living with them at the time, Jim Harvey, age 19, and a female friend of their oldest daughter, age 18 or so.

The object of Mr. Janicsko's affection was one Sandy Markel, a co-worker of Mr. Janicsko's at a Hardee's restaurant in Mechanicsburg. Mrs. Janicsko became suspicious of her husband after receiving reports that he had been spending a great deal of time with Ms. Markel and coming home unusually late. Plaintiff also detected the odor of a strange perfume on her husband's clothes and pillow, and, perhaps most damningly, she had heard her husband murmur of "Sandy" in his sleep. She confronted Mr. Janicsko on July 20, 1989 and he admitted to the affair. He also countered with an accusation of his own—that Mrs. Janicsko was having an affair with their then-foster son, an allegation plaintiff denies wholeheartedly.

Plaintiff demanded that her husband break off the affair. At one point during the day, she wrote out a check for eight dollars made payable to "my mistress, Sandy Markel," and wrote in the "Memo" line "For sexual services rendered." Mrs. Janicsko had her husband sign the check. They then took the check, along with a note written by her husband informing Sandy of the breakup, to Ms. Markel's apartment in Mechanicsburg. When they found that Ms. Markel was not home, Mrs. Janicsko confronted Sandy's landlord. During this conversation, she told the landlord that Sandy was a "prostitute," that she was "selling herself" and that Mr. Janicsko was one of Sandy's customers. Mrs. Janicsko also accused the landlord of being "nothing better than a pimp."

The next day, in the late afternoon, Mrs. Janicsko's older daughter's boyfriend informed her that he had had sexual relations with Sandy Markel and Sandy's daughter at the same time. This revelation caused Mrs. Janicsko a great deal of stress. Later that night, events came to a head as family members became involved in a series of confrontations. On one occasion that evening, Mrs. Janicsko evidently dialed Sandy Markel's telephone number with Mr. Janicsko present, saying that she wanted him to sexually abuse Ms. Markel the same way he had abused her. According to Mrs. Janicsko, her husband broke the connection, struck her several times, and tried to choke her with the phone cord. They broke away and, for a time, things were calm. Then the Janicsko children arrived home, and, in Mrs. Janicsko's words, "all hell broke loose." Mrs. Janicsko became involved in a violent argument with her oldest daughter and with her husband. The Hampden Township police were called to settle the quarrel. Officers investigated and left. Eventually, Mrs. Janicsko left the house herself and climbed into her car with the purpose, she alleges, of going to her parents' home in Johnstown. She then drove to the Hardee's where her husband and daughter worked and dropped off their uniforms. She left the Hardee's and drove toward Mechanicsburg.

Jim Harvey and a companion followed her in a borrowed pickup truck, evidently concerned that his foster mother might do something to hurt herself or Sandy Markel. Mrs. Janicsko stopped at a scene on Trindle Road where several Mechanicsburg police officers were conducting a traffic stop of another vehicle. She spoke briefly with an officer, defendant Pellman, complaining that someone was following her. When the officer walked over to speak to Mr. Harvey in the truck, who had pulled in behind her, she pulled out and drove away. Soon after that, Mrs. Janicsko was pulled over further up the road by defendant Demmy, who had been dispatched from the previous scene by Pellman.

factual contentions which are in dispute are relevant to most of the issues as disposed in this memorandum, and where they are the court will so identify them.

At some point subsequent to being pulled over by Officer Demmy, Mrs. Janicsko was nearly hit by an approaching car. According to plaintiff, she had been standing on the berm when, because of a night blindness condition, the approaching headlights temporarily blinded her. She states that she was jerked back by the officer for no apparent reason and that she was in no danger of being hit by the car. The police officer's version indicates that Mrs. Janicsko stood in the middle of the road and refused to move out of the path of an oncoming car. Demmy claims that he was forced to pull her out of the way or watch her be hit.

At some point, defendant Stoner, another Mechanicsburg police officer, arrived on the scene.

Mrs. Janicsko then returned to her car and locked the doors, refusing to get out despite the efforts of the police officers at the scene, Jim Harvey, and defendant Walter Katherman, a crisis intervention worker from Holy Spirit Hospital. After more than an hour had elapsed, the three police officers broke in and removed Mrs. Janicsko bodily from the car, handcuffing her and shackling her ankles. According to Mrs. Janicsko, she was badly manhandled and received numerous abrasions and bruises. In addition, she says that she was kicked in the chest by defendant Stoner.

The police transported Mrs. Janicsko to Holy Spirit Hospital where she was examined in the Emergency Unit by defendant Joanne Robertson, M.D., who concluded that Mrs. Janicsko should be involuntarily committed pursuant to § 302 of the emergency procedures of Pennsylvania's Mental Health Procedures Act ("MHPA"), 50 Pa. Stat. § 7302(b). During her stay at Holy Spirit, Mrs. Janicsko was also examined by defendant Silvestre De La Cruz. On July 26, 1989, a hearing was held as required by § 303 of the MHPA to extend plaintiff's commitment. The hearing officer dismissed the petition and directed that Mrs. Janicsko be discharged.

After this decision, a hospital social worker, defendant Ron Roberts, contacted Mr. Janicsko, Sandy Markel, Mrs. Janicsko's older daughter and the foster daughter who had been living with the Janicskos to inform them of plaintiff's impending release. Mrs. Janicsko was discharged the same day as the hearing.

Plaintiff filed this suit pursuant to 42 U.S.C. §§ 1983 and 1985 against the various named defendants on September 13, 1990, alleging that they violated her civil rights as guaranteed by the fourth, fifth and fourteenth amendments. Plaintiff also filed a pendent state law claim against defendant Roberts pursuant to the MHPA for violation of privacy. Motions for summary judgment were filed by all four sets of defendants.

*Discussion*

The standards for the award of summary judgment under Federal Rule of Civil Procedure 56 are well known. As the Third Circuit Court of Appeals recently capsulized:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.,* 812 F.2d 141, 144 (3d Cir.1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson,* 106 S.Ct. at 2511; *Equimark,* 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987). Once the moving party has shown that there is an absence of evidence to support the claims of the non-

moving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court will consider the various defendants' motions under these standards.

### I. State Action Problems [2]

As the court sees it, the critical issue with regard to three sets of defendants—the Holy Spirit defendants, Dr. De La Cruz, and Dr. Robertson—is whether their actions in committing Mrs. Janicsko could be considered the actions of the state for the purposes of liability under 42 U.S.C. § 1983.

> Title 42 U.S.C. § 1983 provides that
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured....

Under the terms of its language § 1983 provides a cause of action only against persons who act "under color" of law. The constitutional sections which create the relevant substantive rights in this case—the fourth and fourteenth amendments—apply only to governmental entities. *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Essentially, then, the complained of action in a § 1983 case must be one that is "fairly attributable to the state," and not to some private actor. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

In the present case, all defendants except for the Mechanicsburg defendants appear to be private individuals or entities: Holy Spirit Hospital is a privately owned and operated health care facility and defendants Katherman and Roberts are its employees; Dr. De La Cruz is a private practicing physician and psychiatrist, as is Dr. Roberts.

However, simply because one is not a governmental entity does not mean *per se* that one did not act under the color of state law. The United States Supreme Court has crafted a number of approaches to determine whether sufficient state involvement with private activity exists so that the imprimatur of the state may be attributed to an essentially private actor. In the present circumstances, two of these approaches appear to be relevant, the "close nexus" test of *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) and the government compulsion test propounded in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Peterson v. Greenville*, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).[3]

---

**2.** Plaintiff brings suit under 42 U.S.C. §§ 1983 and 1985. While a § 1983 suit requires some form of state action, as will be discussed in detail in this section, § 1985 does not. However, § 1985, which permits suits against two or more defendants who conspired to deny a plaintiff equal protection under the law due to a plaintiff's membership in a protected class of persons. *See United Bhd. of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983). To state a claim, however, one must show some form of racial or other class-based animus. *See Wagner v. Township of Harmar*, 651 F.Supp. 1286, 1288 (W.D.Pa.1987), *aff'd mem.* 826 F.2d 1058 (3d Cir.1987). Here, according to documents filed with the court, plain-

tiff is white and not part of a protected racial class. Plaintiff, moreover, has presented no evidence as to gender-based animus. Accordingly, the court will dismiss plaintiff's § 1985 claim.

**3.** The other commonly used tests are the "public function" analysis, which is employed to ascertain whether the function performed by the private entity had traditionally been performed by the state, *see Jackson v. Metropolitan Edison, Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and the "symbiotic relationship" test, which looks at the overall relationship between the state and the asserted state actor to see if there is a great degree of interdependence between the two. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Two fairly recent United States Supreme Court cases, *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) discuss the standards for state action in contexts relevant to the present case.

In *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court examined the relationship between a private school and the state of Massachusetts in a § 1983 claim brought by several discharged teachers. The school, which catered to "problem" students who were disruptive in the normal school environment, received nearly all of its funding from public sources and was extensively regulated in personnel matters by state-imposed administrative guidelines. Despite this high degree of state involvement and the presence of state regulations, the Court refused to attribute the firings to state action because they were not "compelled or even influenced by any state regulation." *Id.* at 842–43, 102 S.Ct. at 2771–72.

Similarly, in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982),[4] the Supreme Court addressed the "close nexus" test in terms of private health care facilities subject to strict governmental regulation. *Blum* concerned a suit against the Commissioner of the New York State Department of Public Services based on the actions of a privately operated nursing home which had decided to downgrade plaintiff medicaid patients from high level to lower level care. Despite the fact that the state subsidized the nursing homes, paid the expenses of patients and licensed and extensively regulated the homes, the Court, focusing on the specific decision to downgrade the level of care made by the homes rather than the overall relationship between the facility and the state, held that the home's determinations regarding patient transfers and discharges was in its capacity as private entities according to private professional, not state-mandated, standards. *Blum*, 457 U.S. at 1008, 102 S.Ct. at 2787. As the court in *Blum* noted:

[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.

*Id.* at 1004, 102 S.Ct. at 2786.

In the present case, plaintiff, in a rather conclusory fashion, points to § 302(b) of the MHPA as establishing the necessary nexus between the actions of the defendant doctors and the Holy Spirit defendants and the state. The court has been able to find no cases in this circuit holding that the commitment provisions of the MHPA do or do not convert private health care providers to state actors for the purposes of suit under § 1983.[5]

Following the lead of Supreme Court in *Blum* and *Rendell–Baker*, the court will examine the language of the relevant sections to determine if it replaces private physician or facility discretion with state mandated standards and to determine whether the state compels or encourages a facility's or physician's actions with regard to involuntary commitment.

Section 302(b) of the MHPA, 50 Pa.Stat. § 7302(b) (Purdon Supp.1991) reads:

A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if

---

**4.** Although the defendant in *Blum* was the state through one of its officials and not a private entity, the court nevertheless finds the opinion's analysis on the level of the nexus between private and state action to be highly relevant to the present case.

**5.** A case from the Eastern District of Pennsylvania, *Davenport v. Saint Mary Hosp.*, 633 F.Supp. 1228 (E.D.Pa.1986) touches on the issue of whether the actions of a private hospital may be declared to be the actions of a governmental entity pursuant to the MHPA. In its opinion, the court opines that involuntarily confining persons on mental health grounds could indeed be considered a traditional function of the state. *Davenport*, 633 F.Supp. at 1234. The *Davenport* court, however, specifically declined to decide the state action issue, and its reasoning represents dictum only. *Id.* at 1237. This court moreover finds the exhaustive analysis of the Seventh Circuit in *Spencer v. Lee*, 864 F.2d 1376 (7th Cir.1989), discussed in detail later in this section, in finding involuntary commitment not to be a traditional state function convincing.

the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if it at any time appears there is no longer a need for immediate treatment, the person shall be discharged and returned to such place as he may reasonably direct....

The preceding section, § 301, defines who is subject to "emergency treatment" or commitment. Subsection (a) reads:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

Subsection (b) sets out guidelines for the determination of when a "clear and present danger" to self or others is present. In the case of the threat of harm to others, such danger

shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated.... [A] clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

50 Pa.Stat. § 7301(b)(2) (Purdon Supp. 1991). With regard to the danger to one's self, the section provides that the clear and present danger standard "shall" be shown by establishing that: 1) the person was acting in such a way to evidence an inability to take care of himself; 2) the person had attempted suicide and that there was a reasonable likelihood that the person would attempt again; 3) the person had mutilated himself and that there was a reasonable likelihood he would try again.

Defendants cite a recent case from the Seventh Circuit Court of Appeals, *Spencer v. Lee*, 864 F.2d 1376 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990),[6] which applied state action criteria to a fact situation very similar to this one. In *Spencer*, a patient involuntarily committed by a private doctor and hospital pursuant to an Illinois mental health statute sued both after sustaining injuries from faultily prescribed medication.

The plaintiff in *Spencer* argued that the complex provisions of the mental health act operated to "deputize" private hospitals and physicians in carrying out state functions. In analyzing whether the defendants were essentially carrying out the business of the state in caring for the mentally ill, the Seventh Circuit, with Judge Posner authoring the opinion, looked to the history of private commitment of the mentally ill and to the language of the Illinois statute. First, the court noted that the Illinois statute presented no language of compulsion, nor did it even provide encouragement of private commitments. *Id.* at 1379. Second, the court, reviewing years of history of commitments by private hospitals, found that it was not the type of action which was exclusively in the province of the state. *Id.* at 1381. Accordingly, the Seventh Circuit affirmed the dismissal of the claims.[7]

---

6. The Holy Spirit defendants and defendant Robertson have taken to calling this case *Spencer v. LEON* throughout their respective briefs. The court is certain this was merely an oversight.

7. Another case which presents a similar factual scenario to *Spencer* and the present case is *Jarrell v. Chemical Dependency Unit,* 791 F.2d 373 (5th Cir.1986). In *Jarrell,* the actions of a private drug rehabilitation clinic which involuntarily admitted a young man pursuant to a Louisiana statute were not found to be the actions of the state despite the fact that "[h]is treatment and confinement [were] part of a program that integrates the judgment of public officials, the police power of the state, and treatment at private centers." 791 F.2d at 374.

Plaintiff here does not argue that commitment of the mentally ill is a traditional public function[8], and this court is nevertheless convinced by the *Spencer* court's elaborate history of private commitment of mental patients and its holding that commitment is not necessarily a traditional public function. However, with regard to the state compulsion or close nexus tests, differences in the language of the Pennsylvania and Illinois statutes give the court pause in considering *Spencer* as convincing authority on the issue of whether the directives in the MHPA convert private involuntary commitment into state action.

The Illinois Mental Health and Developmental Disabilities Code, at § 3–600, Ill. Rev.Stat. ch. 91½ ¶ 3–600 (1989) states that "[a] person 18 years of age or older who is subject to involuntary admission and in need of immediate hospitalization *may* be admitted to a mental health facility pursuant to this article." (emphasis added) Paragraph 3–601 of the act details the requirements of the petition for committal. Citing *Blum*, the *Spencer* court interpreted this language as not requiring or even encouraging private actors to commit mental patients: "[P]laintiff does not suggest that the relevant provisions of the Mental Health Code were enacted because the state wants to encourage commitments, any more than state repossession laws are passed because states want to encourage creditors to repossess their debtors' goods." 864 F.2d at 1376. The court further noted, however, that "[i]f the state of Illinois ordered or encouraged private persons to commit the mentally ill, they would indeed be state actors, for they would be doing the state's business." *Id.*

Unlike ¶ 3–600 of the Illinois act, the Pennsylvania statute does not so clearly allocate all the discretion of commitment to a physician, and, in fact, uses language which suggests a degree of coercion. Section 302(b) of the MHPA states the person taken to the facility "*shall* be examined by a physician within two hours of arrival

...*" (emphasis added) and that the physician "*shall*" begin treatment immediately if it is determined that the person is "severely mentally disabled." Further, § 301's detailed definition of "severely mentally disabled," including enumerating specific factors to take into account in the determination of whether the person constitutes a "clear and present danger" to self or others, necessarily takes away discretion which physicians operating under the more vague Illinois act would have.

However, despite these differences, this court cannot hold that the standards set by the MHPA rise to the level of coercion. First, the "shalls" of § 302(b) relating to the necessity of emergency treatment appear to be in place more for the protection of the person to be committed than to compel that person's commitment by private actors. For instance, the reason the legislature requires that a doctor examine a patient for possible involuntary commitment within two hours of the patient's arrival at the facility would appear to be to protect the patient from being forced to wait an undue period of time in custody before being examined by a qualified professional. Such an interpretation fits in with the stated purposes of the MHPA—to put in place due process safeguards for those to be examined and committed and also to ensure that those in need of treatment receive it. *See* 50 Pa.Stat. § 7102 (Purdon Supp.1991) ("It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill.... The provisions of this act shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others."). Second, subsection (a) of § 7302, relating to the application for examination, does not use the language of compulsion, but rather uses the term "may." Accord-

---

**8.** Plaintiff also does not argue that the hospital and the doctors should be considered arms of the state under the "symbiotic relationship" theory, an approach which has been considered in

the context of private hospital-state relationships and has been rejected. *See, e.g., Cardio-Medical Assocs. v. Crozer–Chester Med. Center,* 536 F.Supp. 1065, 1091 (E.D.Pa.1982).

ingly, "Emergency examination *may* be undertaken at a treatment facility upon the certification of a physician stating the need for such an examination...." 50 Pa.Stat. § 7302(a) (Purdon Supp.1991). This language is very close to the statutory language essentially approved by the Seventh Circuit in *Spencer*, that one subject to involuntary commitment "may be admitted to a mental health facility pursuant to this article." *See* Ill.Rev.Stat. ch. 91½, para. 3–600 (1989).

Third, although the term "severely mentally disabled" is extensively defined in § 301 of the MHPA, the court believes that the statute nevertheless leaves a sufficient degree of this determination to the discretion of a medical practitioner using the non-governmentally imposed criteria of the medical profession. The determination of who is "severely mentally disabled" is defined by the statute as being in two parts: 1) that the person's "capacity to exercise self-control, judgment and discretion in the conduct of his affairs" is impaired and that 2) the person poses a clear and present danger to himself or others. *See In re Remley*, 324 Pa.Super. 163, 471 A.2d 514, 517 (1984).

In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), discussed earlier in this section, physicians at private nursing homes were required to fill out extensive questionnaire-like forms assessing a medicaid patient's history and assigning the patient a numerical score based on the answers. The state authored the forms and set their criteria. However, physicians were allowed to depart from the recommendation of the form and use their own judgment despite a "low" score on the form. The Supreme Court found that this was sufficient discretion on the part of the physicians so that the state could not be said to be responsible for the physician's decision. Similarly, in the present case, although the second portion of the definition of "severely mentally disabled"—what constitutes a clear and present danger—is defined with considerable precision in § 301(b), the first portion, relating to one's ability to take care of oneself, is not, and the evaluation of those factors appears to be entirely discretionary to the examining mental health professionals.

Given the language of the relevant sections of the MHPA, this court cannot say that the involuntary commitment of the mentally ill by private physicians and hospitals is, under the MHPA, a function compelled by or sufficiently connected to state directives to attribute those actions to the state. Accordingly, no cause of action may be stated under § 1983 against the three sets of private defendants.

## II. Claims Against Mechanicsburg Defendants

### A. Borough of Mechanicsburg and Mechanicsburg Police Department

■ A municipality may not be liable in a § 1983 action under the doctrine of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities may, however, be held liable for their own wrongs, that is, where an unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36. Here, while plaintiff has pled that such a policy exists in her complaint, she has come forward with no affirmative evidence to support the allegation as required by *Celotex Corp. v. Catrett.* Moreover, she does not even address the issue in her opposition brief. The court, therefore, will grant summary judgment for the Borough of Mechanicsburg and Mechanicsburg Police Department.

### B. Individual Officers [9]

Plaintiff alleges that Officers Demmy, Pellman and Stoner were responsible to her

---

9. It is in this section of the memorandum where the various disputed versions of facts become relevant. Plaintiff has neglected to file a counterstatement of facts as required by Middle District Rule of Court 401.4. Under that rule, the court is empowered to deem the statements of material facts as submitted by defendants admitted by plaintiff. However, since plaintiff's

for violations under the fourth amendment and the due process clauses of the fifth and fourteenth amendments related to her stop, arrest and transport to the hospital. As an initial matter, the court will not consider any claim under the fifth amendment, as the guarantees of the fifth amendment bind only the federal government and there are no federal defendants in the present case.

### 1. Fourteenth Amendment Claim

■ The essence of plaintiff's due process claim against the officers is that their actions deprived her of her liberty without due process of law. In her opposition brief, plaintiff characterizes this as her "primary objection to the actions of the Defendants on the evening in question...." Plaintiff's Brief in Response to Mechanicsburg Defendants at 4. Judging from her brief, plaintiff does not appear to frame the issues relating to her confinement (as opposed to the excessive force claim stemming from her arrest) under the fourth amendment.

According to Mrs. Janicsko's version of the facts as stated in her deposition, after leaving the Hardee's restaurant, she stopped at a scene where two police cars had pulled over a motorist. She stated that she asked for help and informed Officer Pellman that two young men were following her in a pickup truck. She did not apparently apprise him that the young men were her foster son and a companion. Pellman went over and spoke to Jim Harvey. Mrs. Janicsko then stated something to the effect of "Well, if you're not going to help me, I'm leaving." She then pulled out and drove up the road. According to Pellman's affidavit, Harvey informed him that plaintiff had "threatened to kill her husband's mistress, had threatened her own safety and had been driving very erratically." Affidavit of Scott Pellman at ¶ 7. Pellman states that because of his concerns based on these statements, as well as his need to

procure her name for police records since she had stopped and made a complaint, he sent out Officer Demmy to stop her. After being pulled over by Demmy, Mrs. Janicsko locked herself in her car and refused to cooperate at all with the police, twice ignoring the pleas of her foster son to unlock the car and talk to the police. Eventually, Officers Demmy, Pellman and Stoner broke into the car, retrieved Mrs. Janicsko and placed her into an ambulance. She was then signed into Holy Spirit Hospital for emergency examination by Officer Demmy.

The due process clause of the fourteenth amendment protects individuals from the abuse of official power and therefore imposes substantive as well as procedural checks on governmental actions with regard to deprivations of life, liberty or property. *Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123 (7th Cir.1983). Conduct which rises to mere negligence, however, will not state a claim for deprivation of due process. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

Here, even taking the factual contentions made in plaintiff's deposition as true, the court sees no actions on the part of these officers which rises to even negligent conduct in stopping Mrs. Janicsko and taking her into custody. The police officers received a report that Mrs. Janicsko had threatened herself and another person and had just been through a violent and emotionally devastating family quarrel. Moreover, Mrs. Janicsko's actions to any objective eye would seem strange and worthy of investigation, particularly in light of the information just relayed to the officers. First, she informed the Officer Demmy that she was being followed and then immediately left the scene when the officer walked over to speak to the parties in the

deposition is on file, and some of her statements in the deposition contradict those of the various police officers, the court will permit these statements to create a factual dispute under Rule 56. The court will, nevertheless, treat as undisputed various factual allegations which are outside

plaintiff's personal knowledge and therefore uncontroverted by admissible evidence, such as Jim Harvey's conversation with Officer Demmy following Mrs. Janicsko's initial stop with the police.

other car. Second, she locked herself in her car and refused to leave or cooperate with the officers. Third, when the officers attempted to forcibly retrieve her she admittedly fought back wildly and even attempted to bite one of the officers.[10]

Section 302(a)(2) authorizes of the MHPA, 50 Pa.Stat. § 7302(a)(2) (Purdon Supp.1991), a "peace officer" to take a person to a facility for an emergency mental examination when "[u]pon personal observation of the conduct of a person constituting reasonable grounds to believe that he or she is severely mentally disabled and in need of immediate treatment...." Here, the facts as related to the officers at the time Mrs. Janicsko was taken into custody coupled with the behavior she exhibited in front of them would appear to provide an adequate basis for taking Mrs. Janicsko into custody under the MHPA. Moreover, even if they acted outside the scope of the statute, the court could not say that their behavior was even negligent in trying get Mrs. Janicsko off the street and into someplace safe. Accordingly, the court sees no due process violation present in this case with regard to the police officers.

### 2. Excessive Force Claim

Mrs. Janicsko also levels an excessive force claim against the officers. This claim focuses on the conduct of the officers in forcibly extricating her from her car, shackling and handcuffing her, and placing her in the ambulance.

In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the United States Supreme Court held that the sole source of constitutional protection against the use of force in the context of an arrest, investigatory stop or other type of seizure is the fourth amendment. The standard for analysis as set forth in *Graham* is an objective one: the conduct must be evaluated "from the perspective of a reasonable officer on the scene, rather that with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. This analysis must "embody the allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are often tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872.

In deciding whether unnecessary force has been used, Judge Friendly of the Second Circuit Court of Appeals outlined a number of factors to which courts may look:

> Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied sub nom. Employee–Officer John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

In the present case, the court sees only one application of force which could potentially rise to the level of a constitutional violation, and that is the four kicks defendant Stoner is alleged to have leveled at plaintiff's chest while the officers struggled to extricate her from the car and place her into the ambulance. The other measures used by defendants, the restraints, the pulling of hair, the manhandling, may be viewed as a matter of law the concommitants of a contested arrest. The alleged kicking by defendant Stoner, however, is an action of a different order.

Here, Stoner denies that he kicked plaintiff. The Mechanicsburg defendants argue that even accepting Mrs. Janicsko's assertion as true, she nevertheless can not show any injury which would give rise to a violation of her constitutional rights. Defendants rely on the case of *Johnson v. Morel*,

---

**10.** Note that this assessment leaves out the dueling versions of the incident in which Mrs. Jan-

icsko was or was not standing on the highway while a car approached.

876 F.2d 477 (5th Cir.1989) (per curiam), in which the Fifth Circuit Court of Appeals held that a plaintiff in an excessive force action must show "significant injuries" for an action to rise to the level of constitutional violation. If a plaintiff only experiences minor pain, there is no violation. Defendants argue that, under this formulation, Mrs. Janicsko has not shown any constitutionally cognizable injury. They point out that although she states she was kicked by Stoner, when asked at the hospital emergency room where her abrasions had come from, she identified her family. She did not inform any doctors of the bruises on her chest, nor did she ever identify the police as the inflicters of the wounds.

This court is reluctant to accept the holding of *Johnson* for several reasons. First, the court believes that the Fifth Circuit places too much emphasis on the end result of police actions, when the actions themselves may have been outrageous. *See Moody v. Ferguson,* 732 F.Supp. 627, 631 (D.S.C.1989) ("the Court attaches no significance to the fortuitous fact that the bullet caused Moody no physical injury"). Second, as far as this court can tell, the Fifth Circuit is the only circuit to accord so much weight to the extensiveness of injuries in an excessive force claim. Sitting in the Third Circuit, this court has severe doubts about adopting the position of another appeals court where the Third Circuit has not given any indication of ruling similarly and where there is not at least the semblance of a consensus among several courts.[11] Third, the strength of the *Johnson* holding even within the Fifth Circuit presents a question mark. Seven of the 16 judges who considered the case issued a concurring opinion which argued that severe injuries should not be considered in assessing whether a constitutional violation occurred. Instead, the concurring judges' opined, such a consideration should bear on the extent of damages. *Johnson,* 876 F.2d at 481.

Given the disputed versions of the kicking incident, the court believes that the issues of 1) whether the incident occurred at all, and, 2) if it did, whether that force was excessive, is an issue for the finder of fact. Accordingly, the court will grant the Mechanicsburg defendants motion insofar as it dismisses claims against defendants Demmy and Pellman, and will limit the excessive force claim against Stoner to the allegations of kicking during the officers' attempt to take Mrs. Janicsko into custody.

### III. MHPA Privacy Claim

█ The court will also dismiss plaintiff's privacy claim against Ron Roberts under § 111 of the MHPA, 50 Pa.Stat. § 7111 (Purdon Supp.1991). This is a state claim appended to plaintiff's federal civil rights claims. According to plaintiff's brief in response to the motion for summary judgment of the Holy Spirit defendants, there is no separate federal claim against Mr. Roberts. Accordingly, he is in this suit only pursuant to the court's pendent party jurisdiction.

Recently, Congress enacted the Judicial Improvements Act of 1990, codified at 28 U.S.C. § 1367. This statute permits pendent party jurisdiction over purely state law claims which "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). With regard to the present case, the effect of this language could be to extend pendent party jurisdiction over the state law claim against defendant Roberts, at least within the bounds of subsection (b) of the section, which limits the exercise of such "supplemental jurisdiction" to occasions where it would not "be inconsistent with the jurisdictional requirements of section 1332." However, the court need not analyze the MHPA claim under these standards, as the new statute is effective only as to civil actions commenced after December 1, 1990. This action was filed in September 1990. Therefore, the rule in effect when plaintiffs filed their suit will apply.

---

11. In fact, two recent cases from two courts of appeal have specifically disagreed with the *Johnson* holding, *McHenry v. Chadwick,* 896 F.2d 184, 187 (6th Cir.1990) and *Titran v. Ackman,* 893 F.2d 145, 147 n. ** (7th Cir.1990).

The state of the law of pendent party jurisdiction in September of last year was defined by the Supreme Court pronouncement of *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), an opinion overruled in part by the new supplemental jurisdiction section. In *Finley,* the Court stated that, absent an "affirmative grant" of pendent jurisdiction in the federal statute providing the original cause of action, there can be no pendent party jurisdiction. In the present case, the court sees no such affirmative grant in § 1983. Jurisdiction is made less compelling because defendant Roberts is a private party and not liable under § 1983 while the lone remaining defendant, Officer Stoner, is a government employee. The court therefore will deny jurisdiction over the claim against defendant Roberts. *See Lee v. Gateway Inst. & Clinic, Inc.,* 732 F.Supp. 572 (W.D.Pa.1989); *see also Stallworth v. City of Cleveland,* 893 F.2d 830 (6th Cir.1990) (dismissing pendent party defendants in § 1983 claims).