**Rhoda OKUNIEFF, Plaintiff,**

**v.**

**Richard ROSENBERG, M.D., personally, Anne Skomorossky, M.D., personally, Loraine Innes, M.D., personally, Stan Acrow, M.D., personally, Elizabeth Mirabello, M.D., personally, Jane Doe, personally, Columbia Presbyterian Medical Center, Herbert Pardes, in his official capacity of head of the Department of Psychiatry of Columbia Presbyterian Medical Center, Defendants.**

**No. 97 CIV. 3205(RWS).**

United States District Court,
S.D. New York.

May 7, 1998.

Touro College, Jacob D. Fuchsberg Law Center, Mental Disability Law Clinic (William M. Brooks, of Counsel), Huntington, NY, for Plaintiff.

Shapiro, Beilly, Rosenberg, Albert & Fox, (Lewis Rosenberg, Barry I. Levy, Angela Thompson–Tinsley, of Counsel), New York City, for Defendant Richard Rosenberg, M.D.

Martin, Clearwater & Bell (Peter T. Crean, Gregory J. Radomisli, Tiffany L. Bauman, of Counsel), New York City, for Remaining Defendants.

*OPINION*

SWEET, District Judge.

Defendants Anne Skomorossky, M.D., Lorraine Innes, M.D., Stan Arcow, M.D., Elizabeth Mirabello, M.D., Presbyterian Hospital in the City of New York, s/h/a Columbia Presbyterian Medical Center, and Herbert Pardes, M.D. (collectively, the "Hospital Defendants"), and Defendant Richard Rosenberg, M.D. (individually, "Rosenberg," together with the Hospital Defendants, the "Defendants") have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., in this action filed by Plaintiff Rhoda Okunieff ("Okunieff") on the grounds that they are not state actors, and therefore Okunieff's claim pursuant to 42 U.S.C. § 1983 must fail. Defendants also seek an Order dismissing Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3).

For the reasons set forth below, (1) Defendants' motions for summary judgment are granted, and (2) Plaintiff's state law claims are dismissed.

***Parties***

At the time relevant to this action, Rhoda Okunieff was enrolled in a Masters Degree program in Biostatistics at Columbia University and a Masters Degree program in Mathematics at New York University.

Defendant Columbia Presbyterian Medical Center ("CPMC") is a private medical institution doing business as a private corporation.

Defendant Anne Skomorossky, M.D. was, at the time relevant to this action, a resident at CPMC.

Defendants Lorraine Innes, M.D., Stan Arcow, M.D., and Elizabeth Mirabello, M.D., are private attending physicians with privileges at CPMC.

Herbert Pardes is the head of the Department of Psychiatry at CPMC.

Defendant Rosenberg is a private physician with privileges at CPMC.

***Prior Proceedings***

Okunieff filed this action pursuant to 42 U.S.C. § 1983 on May 2, 1997. The complaint was amended on May 19, 1997. This action arises out of the involuntary psychiatric hospitalization of Okunieff. The complaint alleges violation of Plaintiff's civil rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Okunieff also has filed pendent state law claims, including false imprisonment, and violations of Plaintiff's rights to informed consent, to determine Okunieff's own course of treatment, and to confidentiality.

The instant summary judgment motion by Rosenberg was filed on October 10, 1997, and the motion by the Hospital Defendants was filed November 10, 1997. Argument on both motions was heard on March 12, 1998, at which time the motions were considered fully submitted.

***Facts***

On April 30, 1996, Okunieff went to Rosenberg's office on Fort Washington Avenue for a general physical exam. Rosenberg, at that time, maintained private offices at 161 Fort Washington Avenue and 903 Park Avenue, New York, New York. Okunieff was independently referred to Rosenberg through her insurance company, Oxford Health Plans (the "Oxford Plan"). Rosenberg participated as a primary care physician under the Oxford Plan. This was Okunieff's first visit to Dr. Rosenberg.

Rosenberg's examination of Okunieff revealed that she had been under a lot of stress for a significant period of time, relating to her job and educational responsibilities as well as her personal life. She had also been experiencing depression and crying spells. During the examination, Okunieff began exhibiting symptoms indicative of psychotic behavior. According to Rosenberg, Okunieff told Rosenberg that her parents (who live in Michigan) had been entering her New York apartment and had placed things such as salad dressing and ketchup around her apartment. Okunieff also advised Rosenberg that her employer had suggested she seek psychiatric help.

It was Rosenberg's medical opinion that Okunieff needed immediate psychiatric treatment. Rosenberg arranged for Okunieff to meet with Dr. Judith Lewis, a private psychiatrist, on May 2, 1996. At that point, Okunieff left Rosenberg's office.

Okunieff failed to keep the appointment with Dr. Lewis because she did not know Dr. Lewis and her fees were high. Dr. Lewis contacted Rosenberg on May 2 or 3, 1996, informing him that Okunieff had failed to appear for her appointment. Rosenberg's secretary called Okunieff on the morning of May 3, 1996, asking Okunieff to come to Rosenberg's office. Okunieff agreed, as she wanted to obtain results of her blood test. She, however, was concerned that she would be late for another appointment she had with a gynecologist. Upon Okunieff's arrival, Rosenberg observed that her psychological condition had severely deteriorated since he last saw her on April 30, 1996.

When Rosenberg asked Okunieff to discuss her situation, she appeared frightened to enter his office and ran away as Rosenberg attempted to speak with her in the hallway. It was Rosenberg's medical opinion that Okunieff was experiencing a paranoid psychotic episode and presented a potential dan-

ger to herself. Rosenberg then called Dr. Lewis to discuss Okunieff and her behavior. Dr. Lewis recommended that Rosenberg try to locate Okunieff and have her escorted by hospital security to the psychiatric emergency room for an evaluation. Rosenberg wrote a medical order authorizing hospital security to transport Okunieff to CPMC. Rosenberg is not an employee of CPMC. He merely has privileges there.

Okunieff reappeared momentarily. Again, when Rosenberg attempted to speak with Okunieff, she became agitated and ran out of the office. Rosenberg then alerted security, suspecting that Okunieff would return. According to Okunieff, she left Rosenberg's office because she did not want to discuss her blood test results in the waiting room, and she did not want to be late for her gynecological appointment. She maintains that at no time did she appear agitated in the presence of Rosenberg, nor was she a threat to herself or others.

When Okunieff once again returned to Rosenberg's office, security officers had arrived. Rosenberg advised Okunieff that she would be escorted to the psychiatric emergency room so that she could be evaluated. According to Rosenberg, Okunieff's delusions became so severe that she accused him of being an impostor. Okunieff again ran away and was later found lying on the floor of the adjacent hospital building. The supervising nurse of the hospital building requested that Rosenberg sign an order permitting the use of four-point restraints, if necessary. Rosenberg signed the order, but such restraints proved unnecessary. Okunieff was escorted to CPMC without them.

At the CPMC psychiatric emergency room, Okunieff met with Drs. Anne Skomorossky and Lorraine Innes. Both physicians certified Okunieff for involuntary commitment after concluding that she was dangerous and no adequate alternate forms of treatment existed at the time, as is required under the New York Mental Hygiene Law ("MHL") § 9.27 (McKinney 1996). For Okunieff's commitment to meet the MHL requirements, a staff physician must confirm the two physicians' evaluation. Dr. Stan Arcow executed such confirmation. Okunieff was committed on May 5, 1996. Pursuant to the MHL, Okunieff challenged her confinement and requested a hearing. On May 16, 1996, CPMC was directed to release Okunieff. It did so later that day.

None of the physicians above is a state employee, and CPMC is a private hospital that is licensed to provide emergency psychiatric services and treat mentally disabled persons.[1]

### *Discussion*

#### I. *Standard for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City University,* 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). If there is any evidence in the record regarding the issues on which summary judgment is sought from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See*

1. Under MHL § 31.02, general hospitals may not operate a psychiatric wing without an operating license issued by the New York State Office of Mental Health ("OMH"). CPMC had such a license. CPMC also was licensed by the OMH Commissioner to operate a comprehensive psychiatric emergency program ("CPEP") under MHL § 31.27. A CPEP serves as a primary psychiatric emergency provider.

*Knowles v. New York City Dept. of Corrections,* 904 F.Supp. 217, 220 (S.D.N.Y.1995).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

### II. *Summary Judgment Is Granted Because the Defendants Are Not State Actors*

Section 1983 of Title 42 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C.A. § 1983 (West Supp.1997). The constitutional sections creating the substantive rights in this case are the Fourth and Fourteenth Amendments. Because the Amendments are directed at the States, they can be violated only by "state action" and not by the conduct of a private actor. "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Section § 1983's "under color of law" requirement is treated "'as the same thing' as the 'state action'" requirement under the Constitution. *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (quoting *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)).

To prevail in this § 1983 action, Okunieff must show (1) that Defendants deprived her of a right secured by the Constitution or laws of the United States and (2) that, in doing so, Defendants acted under color of state law. *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156–57, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). As to the first requirement, it has been established that involuntary confinement—or civil commitment—constitutes a significant deprivation of liberty requiring due process protection. *See Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The critical issue in this case, however, is not whether Okunieff has a liberty interest in being free from unwarranted confinement, but whether the actions of a private physician, Defendant Rosenberg, who authorized the transport of Okunieff to CPMC for psychiatric evaluation, and the actions of the Hospital Defendants, who committed Okunieff could be considered the actions of the State for the purposes of liability under 42 U.S.C. § 1983. According to Okunieff, Defendants are state actors because they derived the authority to commit her from the laws of New York State.

"The ultimate issue in determining whether [the Defendants are] subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker,* 457 U.S. at 838 (quoting *Lugar,* 457 U.S. at 937). For conduct of the Defendants to be fairly attributable to the State, Defendants must be state actors. *See Lugar,* 457 U.S. at 937. In the instant case, the group of Defendants consists of private physicians and a private hospital. "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992). The Supreme Court has developed a number of approaches to determine whether a private party's conduct may constitute state action, including (1) the state compulsion test, (2) the close nexus/joint action test, and (3) the public function test.

Under the state compulsion test, "a State normally can be held responsible for a private decision only when it has exercised

coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (citing *Flagg Bros., Inc.,* 436 U.S. at 164–65). The close nexus/joint action test requires Plaintiff to demonstrate " 'a sufficiently close nexus between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself.' " *Id.* (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). Finally, the public function test is satisfied if the private party performs a function that is " 'traditionally the exclusive prerogative of the State.' " *Id.* 457 U.S. at 1005 (quoting *Jackson,* 419 U.S. at 353).

These three tests have been employed by various courts of appeals to determine whether involuntary commitment by private parties pursuant to state statute converts private conduct into state action for purposes of § 1983. The First, Third (by affirming the district court opinion), Fourth, Sixth, Seventh, Tenth, and Eleventh Circuits all agree that such action does not constitute state action. *See S.P. v. City of Takoma Park, Md.,* 134 F.3d 260 (4th Cir.1998); *Pino v. Higgs,* 75 F.3d 1461 (10th Cir.1996); *Ellison v. Garbarino,* 48 F.3d 192 (6th Cir.1995); *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 257–60 (1st Cir.1994); *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992); *Janicsko v. Pellman,* 774 F.Supp. 331 (M.D.Pa.1991), *aff'd without opinion,* 970 F.2d 899 (3d Cir.1992); *Spencer v. Lee,* 864 F.2d 1376 (7th Cir.1989) (en banc). The issue has not heretofore been presented to the Second Circuit. The facts of this case lead to the same conclusion. Application of the state compulsion, public function, and close nexus tests below reveals the absence of state action.

## A. *The Hospital Defendants Are Not State Actors*

### 1. *State Compulsion*

The Hospital Defendants are not state actors because the MHL neither compels nor encourages involuntary commitment "any more than repossession laws are passed because states want to encourage creditors to repossess their debtors' goods." *Spencer,* 864 F.2d at 1379. Okunieff was committed pursuant to § 9.27 of the MHL, which by its terms is permissive, not mandatory. *See, e.g., Rockwell,* 26 F.3d at 258 (finding no state compulsion where Massachusetts statute did not compel or encourage involuntary commitments). Like similar state statutes under which state compulsion was lacking, New York's MHL simply sets forth a mechanism to effect involuntary commitments when necessary. *See S.P.,* 134 F.3d at 269–70; *Ellison,* 48 F.3d at 196; *Rockwell,* 26 F.3d at 258; *Harvey,* 949 F.2d at 1130–31; *Janicsko,* 774 F.Supp. at 338–39. The language of MHL § 9.27 is not one of compulsion. MHL § 9.27(a) states:

> The director of a hospital *may* receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person. The examination may be conduced jointly but each examining physician shall execute a separate certificate.

MHL § 9.27(a) (emphasis added). The use of the word "may" is convincing of the lack of encouragement or exercise of coercive power by the state, factors that must exist under the state compulsion test.[2] *See Blum,* 457

2. Courts have even found state compulsion lacking despite existence of coercive language in state statutes comparable to the MHL. Maryland's involuntary commitment statute states that "[i]f an emergency evaluee meets the requirements for involuntary admission and is unable or unwilling to agree to a voluntary admission ..., the examining physician *shall* take the steps needed for involuntary admission." *S.P.,* 134 F.3d at 269 (quoting Md.Code Ann., Health–Gen. § 10–625(a) (1994)). The Fourth Circuit held that although the statute uses language which suggests a degree of coercion, the entire involuntary commitment scheme in Maryland is permissive and leaves much discretion to the private physician or hospital. *See id.* at 270. Likewise, because of the word "shall" in the Pennsylvania statute, the court in *Janicsko* noted that the statute "does not clearly allocate all the discretion of commitment to a physician, and, in fact, uses language which suggests a degree of coercion."

U.S. at 1004. Even though the MHL provides the legal framework under which physicians may involuntarily commit a patient by creating procedures and standards for commitment, as Okunieff points out, it leaves the decision to commit completely to the physician's discretion. *See Janicsko,* 774 F.Supp. at 338–39 (finding significant that physicians retained discretion to determine when commitment is necessary under the Pennsylvania Mental Health Procedures Act).

According to Okunieff, New York State exercises coercive authority because a person may be involuntarily committed only pursuant to the MHL. However, the state compulsion inquiry does not focus on whether commitment may be effectuated only by statute but whether the State compels the action of involuntary commitment. The Hospital Defendants, and not the State, exercised professional medical judgment to determine whether Okunieff needed to be committed. As the Supreme Court held in *Blum,* 457 U.S. at 1008, a state is not liable for determinations that "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Blum* regarded a suit against the Commissioner of New York State Department of Public Services based on actions of a privately operated nursing home that had downgraded the plaintiff Medicaid patients from a high level to a lower level of care. Although the State subsidized the nursing homes, extensively regulated and licensed them, and paid patient expenses, the Supreme Court held that the home's decision to discharge patients to other nursing homes that provided a lower level of care was made in its capacity as a private entity according to private professional, and not state-mandated, standards. *See id.* "[P]hysicians, and not the forms, make the decision about whether a patient's care is medically necessary. . . . . We cannot say that the State, by requiring completion of a form, is responsible for the physician's decision." *Id.* at 1006–07. Here too, the private physicians employed medical judgment based on standards accepted in the medical community when rendering their decision. MHL § 9.27 provided the procedure the physicians were to follow for a valid commitment; for example, the statute requires certificates by two physicians, MHL § 9.27(a), and asks that the physicians consider alternative forms of treatment and care before committing a patient, MHL § 9.27(d). The MHL does not, however, contain comprehensive standards or definitions that may be applied by rote, leading a physician to the conclusion that involuntary commitment is, or is not, warranted in any given case.

Okunieff relies on the Second Circuit's opinion in *Catanzano v. Dowling,* 60 F.3d 113 (2d Cir.1995), in contending that the standards set forth in the MHL replaced the judgment of the private physicians. In *Catanzano,* Medicaid patients challenged decisions to reduce health care services made by certified home health care agencies ("CHHAs"), agencies licensed by New York State to provide home health care services under Medicaid. 60 F.3d at 115. The Second Circuit found the CHHAs to be state actors because, *inter alia,* CHHAs are required to evaluate all potential recipients of care; CHHA decisions are made pursuant to standards defined by the Department of Health in regulations; the statute provides the specific alternatives the CHHA must consider when making efficiency determinations mandated by statute; and the State commands denial of treatment if the CHHA concludes after applying the standards set by the statute that home health care is inappropriate. *See id.* at 119. The coercive power and significant encouragement by the State in *Catanzano* is absent in the instant case. Unlike the statute governing the CHHAs, the MHL does not require commitment, set forth the alternatives a physician must consider before ordering commitment, or define the standards a physician must apply when deciding the fate of one facing involuntary commitment.

New York's MHL states:

"in need of involuntary care and treatment" means that a person has a *mental illness* for which care and treatment as a

*Janicsko,* 774 F.Supp. at 338. Regardless, the court found that the "shalls" related to the necessity of emergency treatment and were included to offer more protection to the person to be committed rather than to compel civil commitment by private actors.

patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment.

"likelihood to result in serious harm" or "likely to result in serious harm" means (a) a *substantial risk* of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a *substantial risk* of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm.

MHL § 9.01, Definitions. Neither "mental illness" nor "substantial risk" is defined. Instead, private physicians must apply generally accepted standards of the medical community to determine whether a patient has a "mental illness" or poses a "substantial risk" to oneself or others. *Cf. Janicsko,* 774 F.Supp. at 339 (finding that despite the extensive definition of the term "severely mentally disabled" in the Pennsylvania Mental Health Procedures Act, the statute "nevertheless leaves a sufficient degree of this determination to the discretion of a medical practitioner using the non-governmentally imposed criteria of the medical profession").

The professional medical judgment exercised by the Hospital Defendants in the instant case is akin to that exercised under MHL § 9.39. The Second Circuit has held that § 9.39 incorporates the medical community's generally accepted standards as a matter of law. *See Rodriguez v. City of New York,* 72 F.3d 1051, 1063 (2d Cir.1995). The plaintiff in *Rodriguez* was involuntarily committed pursuant to MHL § 9.39, which provides that a person "alleged to have a mental illness for which immediate observation, care, and treatment in the hospital is appropriate," may be admitted if a hospital staff physician finds that the mental illness "is likely to result in serious harm" to the individual or others.[3] MHL § 9.39. The *Rodriguez* court confronted the issue of whether the defendants, a city hospital, a resident of the city hospital, and the attending physicians of the city hospital, complied with § 9.39. *See Rodriguez,* 72 F.3d at 1053. The parties' expert physicians had testified to differing definitions of the generally accepted meaning within the medical community of § 9.39's use of "threat[ ] ... of suicide" and "conduct demonstrating [that a person] is dangerous to himself." *Id.* at 1057. The Second Circuit held that the district court below had

> correctly interpreted § 9.39 as "implicitly defer[ring] to medical judgment," and it correctly construed that section as "requir[ing] a physician to make a medical decision, guided by standards that are generally accepted within the medical community." Implicit in § 9.39's requirement that the decision be made by a physician is the premise that the decision will be made in accordance with the standards of the medical profession.

*Id.* at 1062–63 (citations omitted).

As Okunieff acknowledges, although § 9.27 does not require a finding of dangerousness on its face (unlike § 9.39), New York courts have recognized that a person cannot be committed unless deemed dangerous, *i.e.,* by posing a substantial threat of harm to his or her person or others. *See, e.g., Matter of Scopes v. Shah,* 59 A.D.2d 203, 205–06, 398 N.Y.S.2d 911, 913 (3d Dep't 1977). Because the analysis physicians employ for commitments under § 9.39 must also be employed for commitments under § 9.27, it follows that, given *Rodriguez,* as a matter of law the Hospital Defendants exercised professional judgment, guided by generally accepted standards in the medical community, in determining that Okunieff required involuntary commitment pursuant to MHL § 9.27.[4]

3. MHL § 9.39 defines "likelihood to result in serious harm" to include, *inter alia,* "substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself." MHL § 9.39.

4. Peter Stastny, M.D., states in an Affidavit submitted by Okunieff that the determination of "dangerousness" requires a social, rather than a medical, assessment. Dr. Stastny's Affidavit is unhelpful in this summary judgment motion since, as the Second Circuit concluded in *Rodriguez,* the interpretation of the MHL—and the amount of discretion afforded to physicians—is a question of law and not fact.

Compliance with the procedures of the MHL, a statute that neither forces nor encourages involuntary commitments, does not convert private action into state action. New York's involuntary commitment scheme puts in place due process safeguards for the protection of the person confronted with involuntary confinement—hence, the requirement of evaluations by more than one physician and the reminder to physicians that they consider alternate routes of treatment. The actual decision of whether commitment is warranted, however, is left entirely to the sound medical judgment of physicians. Therefore, the actions of the Hospital Defendants cannot be attributed to the State under a theory of state compulsion.

2. ***Close Nexus/Joint Action***

The MHL does not create a sufficiently close nexus between the State and the Hospital Defendants to mandate their classification as state actors. The fact that CPMC has a contract with the OMH that enables CPMC to operate a psychiatric wing and is licensed by the OMH Commissioner to serve as a primary psychiatric emergency care provider does not render the Hospital Defendants state actors. According to the Supreme Court, "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed ... do so." *Jackson,* 419 U.S. at 350 (citation omitted); *see Rockwell,* 26 F.3d at 258 (holding that private hospital and physicians who involuntarily committed plaintiff under Massachusetts statute were not state actors, noting that state regulation, even if extensive, and receipt of federal funds do not establish state action); *Harvey,* 949 F.2d at 1132 (finding licensing and regulation insufficient to transform private hospitals into state actors for purposes of § 1983 liability). The purpose of the close nexus requirement is to "assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Blum,* 457 U.S. at 1004. This assurance is especially important where the plaintiff seeks to subject private parties to § 1983 liability by bestowing on them the title of state actors.

The instant case does not involve a situation where the State has " 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.' "[5] *Harvey,* 949 F.2d at 1131 (quoting *NBC v. Communications Workers of Am., AFL–CIO,* 860 F.2d 1022, 1026 (11th Cir.1988) (citation omitted)). The Eleventh Circuit in *Harvey,* confronting facts similar to the case at bar and the issue of whether involuntary commitment by private parties may be considered state action, found an insufficient nexus between the defendants, a private hospital and private physicians, and the State. *See id.; see also Rockwell,* 26 F.3d at 258 (holding that Massachusetts statute did not create a sufficiently close nexus between private hospital and the State to warrant labeling private actors state actors). The court observed that "[b]oth the Supreme Court and our predecessor circuit have concluded that such a nexus is lacking in circumstances much more compelling than the circumstances in this case." *Id.* (referring to *Rendell–Baker* and *Blum* ).

In *Rendell–Baker,* the Supreme Court examined the relationship between the State of Massachusetts and a private school in a § 1983 claim brought by discharged teachers. The private school, which taught special needs children, received 90% of its funds from the State and was extensively regulated in personnel matters by state-imposed guidelines. The Court refused to attribute the teachers' discharges to state action. *See Rendell–Baker,* 457 U.S. at 840–43. Similarly, the Supreme Court in *Blum* found that despite extensive state regulation and funding of private nursing homes, state action could not be maintained. *See Blum,* 457 U.S. at 1004.

Thus, because the MHL merely licenses private physicians and hospitals to commit

5. As described in the discussion of state compulsion, the MHL leaves the decision to commit in the hands of the physician.

involuntary commitments yet in no way influences the decisions to commit, its relationship with the Hospital Defendants is insufficient to pass the close nexus/joint action test.

2. ***Public Function***

Involuntary commitment under the MHL fails the public function test because the powers exercised by the Hospital Defendants are not the sort that were "traditionally the exclusive prerogative of the State." *Jackson,* 419 U.S. at 353. This exclusion function theory is related to situations where the State delegates its responsibilities to private parties and then attempts to escape liability for constitutional violations caused by private parties acting pursuant to the delegation. *See Rockwell,* 26 F.3d at 258. This is not what New York State did in allowing physicians to decide whether involuntary commitment is in the best interests of a patient. The responsibility for invalid commitment lies with the physician as a private individual. Very few activities are "exclusively reserved to the states." *Flagg Bros., Inc.,* 436 U.S. at 158–59; *see White v. Scrivner Corp.,* 594 F.2d 140, 142 (5th Cir.1979) (noting that even arrest, search, and detention are not exclusively reserved to states). Election is one such area. *See Flagg Bros., Inc.,* 436 U.S. at 158. Involuntary commitment is not. *See Rockwell,* 26 F.3d at 258–60 (unwilling to categorize involuntary commitment in Massachusetts as a public function); *Harvey,* 949 F.2d at 1131 (same regarding Georgia statute).

According to Okunieff, the public function test is satisfied because involuntary commitment is *a* function of New York State in that New York authorizes confinement of the mentally ill. Okunieff, however, does not take the analysis far enough. As the Supreme Court declared in *Rendell–Baker,* "our holdings have made clear that the relevant question is not simply whether a private group is serving *a* 'public function.' We have held that the question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'" 457 U.S. at 842 (quoting *Jackson,* 419 U.S. at 352 (emphasis added)); see *Rockwell,* 26 F.3d at 258 finding that involuntary commitment is not a public function, and stating: "In order for a private actor to be deemed to have acted under color of state law, it is not enough to show that the private actor performed *a* public function. The plaintiff must show that the private entity assumed powers 'traditionally *exclusively* reserved to the State.'" (quoting *Jackson,* 419 U.S. at 352 (emphasis added)). The fact that the private party has powers coextensive with the state is irrelevant to determine that state action exists. *See Harvey,* 949 F.2d at 1131. Exclusivity is required.

Okunieff misstates *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), to support her contention that the exclusivity test required by the Supreme Court should not be followed. In *Edmonson,* the Court held that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of race. The Court found that the action in question was the performance of a traditional governmental function due to the distinct nature of peremptory challenges. The Court stated that "the peremptory challenge has no utility outside the jury system, a system which the government *alone* administers." *Id.* at 622 (emphasis added). In addition, Okunieff's reliance on *Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 F.2d 17 (2d Cir.1979) to circumvent the exclusivity prong of the public function test is similarly misplaced. The case actually supports the use of "exclusivity". The Second Circuit in *Janusaitis* relied on *Flagg Bros., Inc.* and held that fire protection has traditionally been the exclusive function of the state and thus constitutes state action if performed by a private entity. *See id.* at 22. The court quoted *Flagg Bros., Inc.* when it stated that "[a]mong (such exclusive municipal functions) are such functions as education, fire and police protection, and tax collection." *Id.* (quoting *Flagg Bros., Inc.,* 436 U.S. at 163–64).

Two district court cases in New York have abandoned the exclusivity requirement to find that involuntary commitment is indeed a public function. *See Rubenstein v. Benedictine Hosp.,* 790 F.Supp. 396 (N.D.N.Y.1992); *Ruffler v. Phelps Memorial*

*Hosp.*, 453 F.Supp. 1062 (S.D.N.Y.1978). The *Ruffler* court held that New York Hospital, a private hospital, had engaged in state action by involuntarily confining plaintiff pursuant to the MHL. *See id.* at 1067–71. The *Ruffler* decision found that involuntary confinement was a public function in New York because of the legislature's assumption of responsibility for the mentally ill in § 7.01 of the MHL [6] and its extensive regulation of private agencies which provide mental health services. *See id.* at 1069. However, *Ruffler* concluded existence of state action on a theory that civil commitment is a matter of public concern without a finding of "exclusivity". This contention is contrary to the Supreme Court's analyses in *Flagg Bros., Inc., Jackson, Rendell–Baker,* and *Blum.* The Eleventh Circuit criticized the *Ruffler* court because it "only inquired as to the public nature of the function and did not determine if exclusivity existed." *Harvey,* 949 F.2d at 1131 n. 10. In addition, contrary to *Ruffler,* extensive regulation does not make involuntary confinement an exclusive state function. In *Rendell–Baker,* plaintiffs asserted that the private school for maladjusted high school students performed a traditional public function because of extensive state regulation and funding. The Supreme Court disagreed, stating:

> Chapter 766 of the Massachusetts Acts of 1972 demonstrates that the State intends to provide services for such students at public expense. *That legislative choice in no way makes these services the exclusive province of the State.*

*Rendell–Baker,* 457 U.S. at 842 (emphasis added). Likewise, New York's authorization of civil commitment and assumption of care for the mentally ill under MHL § 7.01 do not convert involuntary commitment into a function traditionally reserved to the State. Finally, *Ruffler* neglected the importance of the fact that the decision to commit Okunieff was based on medical judgment according to generally accepted medical standards, a fact the Supreme Court found crucial in *Blum,* as discussed above. For these reasons, *Ruffler* will not be followed.

*Rubenstein* is also unpersuasive as it relied heavily on *Ruffler.* In fact, the *Rubenstein* court recognized that *Ruffler* was criticized for not applying the "exclusivity" requirement in its public function analysis, but did not address why the requirement should not be followed. Rather, the court held that the activity of the private hospital in committing an individual was nonetheless reserved to the State under either its *parens patriae* or police power. *See Rubenstein,* 790 F.Supp. at 406. The court asked, "[i]f the State is not providing the authority to deny an individual his liberty what is providing the authority?" *Id.* (quoting *Plain v. Flicker,* 645 F.Supp. 898, 905 (D.N.J.1986)). To answer the court's inquiry, the authority which private physicians and private hospitals use to commit an individual is the professional medical standard of the community where the physicians' medical judgments are based. The professional standard at which a physician is accountable is not established by the State.

The private physician is not exercising governmental authority when he or she uses medical judgment in assessing the dangerousness of an individual for commitment purposes. Similarly, when a physician prescribes medication, the physician is not exercising government authority but rather using medical judgment despite the fact that the physician is licensed by the State to prescribe medication. Authorization by the State does not constitute a public function. Failing to abide by the exclusivity requirement would create a slippery slope whereby private physicians who prescribe medication would be deemed state actors simply because the authority to license the physicians lies with the State.

In her quest to convert the Hospital Defendants into state actors, Okunieff proclaims that *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), and *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), leave little doubt that the Hospital Defendants engaged in state action. Both cases, however, are distinguish-

6. MHL § 7.01 states: "The state of New York and its local governments have the responsibility for the prevention and early detection of mental illness and for the comprehensively planned care, treatment and rehabilitation of their mentally ill citizens."

able from the instant case as *West* involves prisoners, who are wards of the State, and *Dodson* involves state employees, not private individuals. The *Dodson* Court held that a public defender is not a state actor when defending indigent clients because he or she uses professional judgment in performing a lawyer's traditional function as counsel and takes an adversarial stance against the State. *See Dodson,* 454 U.S. at 318–20. *Dodson's* context is so far removed from the case at bar that it does not merit discussion.[7] *West,* on the other hand, does involve physicians. Okunieff's reliance on *West,* nonetheless, is misplaced because it was decided in the context of providing medical treatment to prisoners.

The Supreme Court held in *West* that a private physician under contract with the State to provide medical care to prisoners engaged in state action despite the fact that the challenged activity turned on medical judgments. The Court reasoned that the physician within the state prison performed a public function reserved to the State—providing medical care to prisoners. Unlike Plaintiff in the instant case, the prisoner in *West* was not free to consult a physician of his choosing. "[T]he only medical care West could receive for his injury was that provided by the State." *West,* 487 U.S. at 55. The State bore an affirmative, constitutional duty to provide medical treatment to those in custody. *See id.* at 56. Here, the State bears no duty to commit individuals involuntarily. The *West* Court realized that "although the provision of medical services is a function traditionally performed by private individuals, the context in which [these services were performed] for the State ... distinguishes the relationship between [this physician] and West from the ordinary physician-patient relationship." *Id.* at 56 n. 15. The rationale behind the *West* decision lies in the fact that the prisoner relies entirely on prison authorities for medical treatment, and therefore health care in state prisons is the exclusive prerogative of the State. *See id.* at 55. The context in this case differs. It does not follow that because private physicians who are contracted by the State to provide medical care to prisoners, who are wards of the State, can be held as state actors, so too must private physicians who involuntarily commit citizens due to authorization by the State. Okunieff's assertion that just as the Eighth Amendment requires the State to provide adequate medical care to prisoners, the Fourteenth Amendment requires the State to provide minimally adequate care to mentally ill patients confined in institutions is inapposite to this case. It is not the care Okunieff may have received after commitment that is at issue but the decision by the Hospital Defendants to commit the Okunieff in the first instance.

A proper determination of whether an activity is a public function involves delving into the history of the activity. The circuit courts that have studied the history of involuntary commitment have concluded that such commitments have not traditionally been the exclusive prerogative of the State. *See Rockwell,* 26 F.3d at 258–60 (finding that history of involuntary commitment in Massachusetts reveals it is not a public function); *Spencer,* 864 F.2d at 1380–82 (same regarding involuntary commitment in Illinois). This inquiry, of course, is state specific. In the case at bar, history demonstrates that involuntary commitment has not been exclusively a function of New York State and thus is not a traditional public function.

In New York, involuntary treatment and confinement of the mentally ill originated in private homes, and later it took place in both private and public institutes. Since the beginning of the United States, families, friends, and guardians have cared for the mentally ill privately. *See* Henry M. Hurd et al., 1 *The Institutional Care of the Insane in the United States and Canada* 40 (Johns Hopkins Press 1916). According to Blackstone, writing in 1765, "[o]n the first attack of lunacy, or other occasional insanity, while there may be hope of a speedy restitution of reason, it is usual to confine the unhappy objects in private custody under the direction of the nearest friends and relations." 1 *Commentaries on the Laws of England* 305.

7. If anything, *Dodson's* analysis regarding the use of professional judgment may be used as an analogy to support the Hospital Defendants' assertion that there is no state action in this case.

The New York Hospital, a private, not-for-profit hospital, was one of the first institutions to admit the mentally ill for in-patient care. The first patient was received in 1792. *See* Albert Deutsch, *The Mentally Ill in America* 97–98 (2d ed.1949). In those days, "commitment could be effected with the greatest of ease. No specific safeguard existed for the protection of the personal liberty of the supposedly mentally ill person. The pauper and indigent insane might be summarily committed to the poorhouse, prison or hospital by friends or relatives or by order of public officials ...." *Id.* at 420.

In New York, there seems to have been little early legislation in reference to the mentally ill, and if they were dependent, they were probably classed among the poor. *See* Hurd, *supra,* at 86. "The violent and dangerously insane were handled under the authority of the sovereign's police powers." Samuel J. Brakel et al., *The Mentally Disabled and the Law* 22 (3d ed.1985). In 1838, private asylums, county poorhouses, public asylums, and lunatic asylums of the City of New York were recognized by statute. *See* Hurd, *supra,* at 87. The care of the mentally ill, however, was not recognized as a public duty, except insofar as it sought to protect the public from violent persons. *See id.* Private institutional care predated public institutional care, as it was not until 1842 that laws were passed to erect the first state institution in New York. *See id.* The earliest movement toward complete state care did not come until the second half of the nineteenth century. *See* Deutsch, *supra,* at 234. In 1874, New York passed a law authorizing any asylum, public or private, institution, home, or retreat that cared for the mentally ill, without court order, to commit for five days any person upon the certificates of two physicians. 1874 N.Y. Laws ch. 446, § 1. *See Rockwell,* 26 F.3d at 259 (noting similar law passed in Massachusetts).

History reveals that involuntary commitment has long been a private remedy, although subject to safeguards, like repossession, self-defense, citizen's arrest, and other infringements on rights of liberty and property. *See Spencer,* 864 F.2d at 1380. Even if New York had been following the same procedure set forth in the current Mental Hygiene Law for the last 200 years, that would tend to show that

> commitment had not been an exclusively public function, any more than transportation, or the removal of trespassers from one's property, or the repossession of goods from a defaulting debtor are exclusively public functions—that almost a century before the enactment of the Fourteenth Amendment, private persons were doing what [Plaintiff] contends is the work of the state today even when done by private persons,

*id.,* such as the Hospital Defendants. That the State can authorize commitment through its *parens patriae* or police powers does not make it the exclusive prerogative of the State. The reasons for private commitment are practical. A person may need to be restrained immediately, by his or her family, physician, or even a stranger, and there may not be a public institution at hand. *See id.* at 1381. This is why the responsibility for treatment of the mentally ill is shared between private and public institutions. Simply because commitment today may only be effected in the manner prescribed by New York State does not prove that the power to commit has traditionally been the exclusive prerogative of New York. "Private commitment is no more state action than a citizen's arrest, the repossession of chattels, or the ejection of trespassers is." *Id.*

As this Court stated in *Thomas v. Beth Israel Hosp., Inc.,* as a general rule, private hospitals do not act under color of state law for § 1983 purposes. 710 F.Supp. 935, 940 (S.D.N.Y.1989) (noting that private hospital was not acting under color of law when it complied with the New York Child Protective Services Act by reporting suspected child abuse). The rule applies here. The application of the state compulsion, close nexus/joint action, and public function tests establish that the MHL, at most, provides a licensing provision enabling the private hospital to receive mental patients. Licensing and regulations are insufficient to transform the Hospital Defendants into state actors for § 1983 purposes. Holding otherwise would expose private physicians and private hospi-

tals to § 1983 liability whenever they act pursuant to the MHL, despite the fact that their actions reflect medical judgments made according to generally accepted professional standards that are not established by New York State.

### B. *Defendant Rosenberg Is Not a State Actor*

Defendant Rosenberg did not engage in state action when he authorized transport of Okunieff to CPMC for a psychiatric evaluation. Like the Hospital Defendants, Rosenberg is a private actor. Therefore the state compulsion, close nexus/joint action, and public function tests are applicable. Their application mandates the same conclusion as when applied to the Hospital Defendants: there was no state action. A test-by-test analysis, however, proves unnecessary because Rosenberg did not commit the act of which Okunieff complains. He was not among the physicians who committed Okunieff against her will pursuant to the MHL. His actions are one step removed from those of the Hospital Defendants. Rosenberg simply took steps necessary to secure a psychiatric examination of Okunieff. Okunieff's contention that Rosenberg should be deemed a state actor because it was his actions that set in motion the events that eventually led to her civil commitment cannot be sustained. Indeed, the Tenth Circuit in *Pino* dismissed a claim against a private therapist who advised police to transport the plaintiff to a hospital for psychiatric evaluation. *See Pino,* 75 F.3d at 1463, 1466. The court reasoned that:

> [the therapist's] conduct does not rise to the level of state action merely because [the officers] responded to her call to the dispatcher and heeded her advice to transport Appellant to the hospital. Moreover, [the therapist], by her actions ... did not exercise "some right or privilege" or act under a "rule of conduct" created by state law as required by *Lugar.*

*Id.* at 1465; *see Harvey,* 949 F.2d at 1132 ("[P]rivate persons ... who act pursuant to state statutes to commit the mentally ill cannot be held liable under section 1983."). Unlike civil commitment, ordering transport of Okunieff to the hospital for a psychiatric evaluation does not constitute a significant deprivation of liberty requiring due process protection. As the facts indicate, Okunieff was not subjected to four-point restraints during transport.

In deciding that Okunieff required a psychiatric evaluation Rosenberg relied not on statute but on pure medical judgment, thereby dispelling any notion of state compulsion. In addition, this function has never been within the exclusion function of the State. In fact, one need not be a physician to facilitate a psychiatric evaluation of a person. A father, mother, sister, brother, husband, wife, or any person with whom the person alleged to be mentally ill resides could secure such an evaluation, *see* MHL § 9.27(b), or request the person be taken into custody, if necessary, for the purposes of obtaining a psychiatric evaluation. *See Watkins v. Roche,* 529 F.Supp. 327, 329–30 (S.D.Ga.1981) (finding that private physician's execution of certificate involuntarily subjecting plaintiff to psychiatric examination did not constitute state action because ordinary citizens had the same authority as the physician and the physician was not required or compelled by statute to execute the certificate). Thus, Okkunieff's assertion that the law treats physicians differently than other citizens as physicians are authorized to make decisions that can result in involuntary commitment is misplaced.

It was found above that involuntary commitment itself does not convert a private actor into a state actor. *A fortiori,* actions taken by a private physician to set the ball rolling so that involuntary commitment might be a possibility certainly do not equal state action. Even if involuntary commitment were attributable to the State, requesting a psychiatric examination that ultimately leads to involuntary commitment surely cannot be. Holding otherwise would cast the net of § 1983 liability too far. A mother who brings her disturbed daughter to CPMC for psychiatric evaluation would be subject to § 1983 liability. Okunieff's claim is neither practical nor legally valid. A private physician does not trigger state action when he or she determines a patient is in need of imme-

diate psychiatric evaluation and takes steps necessary to facilitate that evaluation.

Because Defendant Rosenberg is not an employee or agent of the State, his decision and actions constituted nothing more than treatment of a patient based only on medical judgment, and most importantly, he was not the physician who involuntarily committed Okunieff, Okunieff's § 1983 claim must fail for lack of state action.

### III. *Okunieff's Pendent State Law Claims Will Be Dismissed*

A district court may decline supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Since the parties are in an early stage of the case and the federal claims have been dismissed, leaving no independent basis of jurisdiction over the remaining state claims, they will also be dismissed. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994); *Modeste v. Local 1199,* 850 F.Supp. 1156, 1167 (S.D.N.Y.1994), *aff'd,* 38 F.3d 626 (2d Cir.1994).

### *Conclusion*

In sum, Okunieff has failed to raise a genuine issue of material fact that the Hospital Defendants and Defendant Rosenberg's actions could be attributed to the State. For the reasons set forth above, Defendants' motions for summary judgment are granted, and all pendent state law claims are dismissed for lack of supplemental jurisdiction.

It is so ordered.