**Joan TURTURRO, Plaintiff,**

v.

**CONTINENTAL AIRLINES, et al., Defendants.**

**Joan Turturro, Plaintiff,**

v.

**Trinitas Hospital, et al., Defendants.**

**No. 00 Civ. 0637(PKC).**

United States District Court, S.D. New York.

Aug. 16, 2004.

Paul A. Shneyer, Shneyer & Associates, Ltd., New York City, for plaintiff.

George P. McKeegan, McKeegan, McShane & Drago, P.C., Angel Kelly, Keith Harris, Milton H. Pachter, New York City, Vincent K. Loughlin, Johnstone, Skok, Loughlin & Lane, Westfield, NJ, for defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

While the plane was taxiing to the runway at Newark Airport, plaintiff Joan Turturro, a television news editor, took out her cell phone and dialed 911 to report that she was being held hostage on board the flight. Ms. Turturro had boarded Continental Airlines, Flight # 779 to Costa Rica around 5:30 p.m., after an extended

delay during which one of her two carry-on bags was stolen. After embarking the plane, she realized that her prescription medication, Xanax, which she took to relieve anxiety, was in the missing bag and requested, but was denied, the opportunity to disembark. After making the hostage claim in her 911 cell phone call, the pilot was directed to return the plane to the gate and the Port Authority police were summoned. She was detained by the Port Authority police and brought to the psychiatric emergency room at the Elizabeth Medical Center. She was initially detained by the hospital for overnight observation but, later in the evening, was released and she departed the hospital at approximately 1 a.m. on January 27.

Ms. Turturro claims to have suffered post-traumatic stress as a result of these events and suffered loss of vacation time, a reduced earning capacity by reason of an inability to work longer hours, and a diminution in value of an investment in Costa Rica. (Deposition of June 3, 2003, cited as "Tr.", 45) She asserts that she was not able to fly to Costa Rica until the next weekend and was not able to reschedule meetings that she had missed. (Tr. 57–58) In addition, her fear of flying has been exacerbated to the point that she no longer travels by airplane. (Tr. 57–58) She also asserts that she has suffered reputational injury by reason of newspaper coverage of the incident in that "people at work made remarks to the fact that they didn't realize I was crazy ... [p]eople were very concerned about me, and my mental health." (Tr. 65–66)

Ms. Turturro, represented by counsel, commenced this action against the Port Authority of New York and New Jersey (the "Port Authority") and certain "John Doe" defendants, later identified as Sergeant Darcy Licorish and Officer Naeemah Brown, pursuant to 42 U.S.C. §§ 1983 and

1985, alleging a violation of her constitutional rights and certain state law claims, *Turturro v. Port Authority of New York and New Jersey, et al.,* 00 Civ. 8870(PKC). She also sued Continental Airlines with whom she has since settled, *Turturro v. Continental Airlines, et al.,* 00 Civ. 0637(PKC). Finally, on January 24, 2002, Ms. Turturro filed a third lawsuit against Trinitas Hospital, Elizabeth Medical Center, and Dr. C.L. Lin (the "Hospital Defendants"), alleging claims under sections 1983 and 1985, as well as state law claims, *Turturro v. Trinitas Hospital, et al.,* 02 Civ 0576(PKC). By Orders entered August 26, 2003 and October 14, 2003, all three actions were consolidated under the docket number of the first filed action. No consolidated pleading was ever filed and I have before me two separate complaints: a Second Amended Complaint against Continental Airlines and the Port Authority Defendants (the "P.Auth. Cmplt.") and a Complaint in which only the Hospital Defendants are named (the "Hosp. Cmplt.").

A district court has broad latitude in fashioning an order of consolidation under Rule 42, Fed.R.Civ.P. *See* 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* § 2383 (West 1995). Indeed, the consolidation order in these cases was entered by the Court *sua sponte.* Because the parties have proceeded without a consolidated pleading and no further judicial economy is presented by the actions remaining consolidated, I will vacate the orders of consolidation insofar as they consolidated the action against the Hospital Defendants with those against other defendants. The action against the Hospital Defendants will proceed under the separate docket in *Turturro v. Trinitas Hospital, et al.,* 02 Civ. 0576(PKC).

Upon consideration of the Hospital Defendants' motion for summary judgment, I

conclude that all federal claims against the Hospital Defendants should be dismissed and further that there is insufficient reason to exercise supplemental jurisdiction over any remaining state law claims. Accordingly, all claims against the Hospital Defendants will be dismissed.

For the reasons set forth below, the motion for summary judgment of the Port Authority is granted insofar as all federal claims against it are dismissed. The motion for summary judgment of the two officers on qualified immunity grounds is denied without prejudice to renewal upon a proper foundation. If, at that juncture, the two officers are successful in dismissing the claims against them on qualified immunity grounds, then all federal claims will have been dismissed and I can assess whether supplemental jurisdiction should be exercised over the state law claims asserted against the remaining defendants.

## I. *Plaintiff's Sworn Version of the Events of January 26.*

Plaintiff was flying to Costa Rica for a ten-day trip, principally in connection with investment property she owned. (Tr. 81) She arrived at Newark Airport at or around 2:30 or 3 p.m. for a flight that she recalls having been scheduled for 4:30 p.m. (Tr. 82) She "[c]hecked in, changed money, sat down had a cigarette and a glass of wine, and walked the concourse looking for gifts or presents for people to bring to Costa Rica and last minute things [she] might have forgotten to pack." (Tr. 82)

She was initially told that the flight was boarding and took the prescription medication Xanax, for which she understood the only restriction was that she should not operate heavy equipment or machinery. (Tr. 83) Xanax had not been prescribed for fear of flying but her doctor was aware of her use of the medication for that purpose. (Tr. 168) Her doctor had told her that it

was "[n]ot a good idea" to mix Xanax with consumption of alcohol. (Tr. 169) Prior to taking the mediation, she had two glasses of white wine. (Tr. 82)

She was informed that the flight was delayed until 5:30 p.m. and decided to find a place to dine. (Tr. 85) She stopped at a cafeteria-style concession, Wok & Roll, and placed her tote bag on the seat next to her and she believes she placed her backpack-pocketbook on the floor near the leg of the chair. (Tr. 81, 86–87) The backpack-pocketbook was not there when she went to leave. (Tr. 87)

She was told by airport personnel that if she wished to report the incident, she would need to go to another terminal. (Tr. 88) At this point, she was not experiencing fear of flying but was "very upset". (Tr. 88) She was told that there was not enough time for her to go and look further for the item and it was time to board. (Tr. 91) She elected to board.

In deciding to board, she "forgot" that her medication, the Xanax, was in the missing bag. (Tr. 91) After arriving in her seat (three rows from the back of the plane, window seat), she went to take a pill and realized that the pills were in the missing bag. (Tr. 91, 94) She informed a flight attendant that she needed to take the medication or "could not continue the flight." (Tr. 94) She told the flight attendant that she wanted to get off and "[h]e said—I believe he said I can't remember now, he might have said it is too late. The doors are closed." (Tr. 95) After she spoke to the flight attendant, "I began to get nervous." (Tr. 96) She then spoke to a second flight attendant. (Tr. 97–99) "I don't remember getting up. I might have. At this point panic was beginning to set in, so I am not quite sure if—". (Tr. 97) She was "[g]etting more and more terrified." (Tr. 99) The first flight attendant reported that he had checked with the pilot and the

pilot "refuses to go back." (Tr. 100) At that point, the plane had moved from the gate. (Tr. 100–01)

By plaintiff's own account, she began sweating, shaking and her voice was trembling. (Tr. 102) "[M]y voice must have been sounding panicky." (Tr. 102) She then started to make calls on her cell phone. (Tr. 103) She called the police emergency number, 911, several times because she could not get through; she spoke to a 911 operator twice. (Tr. 104–5) She told the 911 operator she was being held "hostage":

Q. What did you say?

A. From my recollection I told them that I was being held on Continental Airline, that they would not allow me to get off to get my medicine and they would not bring the plane back to the gate, that they refused to get my medication and *they were holding me hostage.*" (Tr. 105; emphasis added)[1]

Prior to the incident, Ms. Turturro flew two to three times per year, despite her fear of flying. (Tr. 79) She swore under oath that, prior to January 26, she had never heard an announcement on board an aircraft advising that cell phone use was prohibited and she does not remember whether such an announcement was made on board the aircraft on January 26. (Tr. 79–80)

Approximately ten minutes after the "hostage" call, the plane began to return to the gate. (Tr. 108) Passengers were informed on the public address system that the reason was "because we have an un-ruly passenger on board." (Tr. 108) As she left the plane, there were "hisses and booing" from fellow passengers. (Tr. 145)

She disembarked and was met by "a combination of everybody, everybody had their different costumes on." (Tr. 110–11) "It looked like about 20 people." (Tr. 111) Emergency Medical Services ("EMS") checked her and left. (Tr. 113) She believes she spoke with EMS before speaking to Sergeant Licorish and Officer Brown, but is not sure. (Tr. 114) She acknowledges that at that point she might have been sweating and possibly was trembling. (Tr. 116)

A male police officer spoke to her while she was seated in the gate area and informed her, "we are going to go to the hospital. . . ." (Tr. 118) Plaintiff objected asserting that she was "okay". (Tr. 118) At some point, plaintiff expressed a desire to call her fiancé and Officer Brown held her hand down preventing her from doing so. (Tr. 120) Sergeant Licorish pulled the unwilling plaintiff from her seat by her upper arms. (Tr. 122) When asked at her deposition whether he hurt her, she indicated that she did not remember. (Tr. 122) The two officers walked beside her while she was "sandwiched" in the middle. She does not remember if either had their hands on any part of her body. (Tr. 122) After she was lifted from the seat, she does not remember anyone pulling or pushing her, except that the two officers pushed on her shoulders and legs to get her into the ambulance. (Tr. 124) She was not resistant and she was not otherwise restrained (except for an automotive seat-

---

1. With the benefit of a period of self-reflection, plaintiff adheres to the view that it was appropriate to describe her circumstance aboard the plane in a 911 call as a hostage situation. On June 3 2003, she testified as follows:

 Q. Do you think that your behavior on the plane was appropriate?

 A. Yes, absolutely.
 * * * *
 Q. Do you feel that that was poor judgment to make that description as a hostage situation to a 911 emergency phone number?
 A. Nope. (Tr. 190–91)

belt-type restraint). (Tr. 124, 130) She does not know whether the emergency medical personal who spoke to her in the gate area were the same ones who were in the ambulance. (Tr. 127) Officer Brown accompanied her in the rear of the vehicle; plaintiff is not sure whether the vehicle was an ambulance or, perhaps, a police truck. (Tr. 127)

At the hospital, plaintiff was "escorted" from the vehicle. (Tr. 128) At some point, Officer Brown had taken her cell phone and her tote bag from her; the officer handed them to a hospital worker. (Tr. 129)

## II. *The Evaluation of Plaintiff By the Hospital*

Plaintiff's deposition does not touch upon her stay at the Elizabeth Medical Center. In support of summary judgment, the Hospital Defendants have come forward with the depositions of Michelle Bass, the initial screener, Dr. Lin, the psychiatrist who evaluated her and determined to hold plaintiff overnight, and Dr. Edos, the on-call psychiatrist who later determined that plaintiff could be released.

According to Hospital records, plaintiff arrived at Elizabeth Medical Center and was initially interviewed by Micelle Bass at 8:35 p.m. (Loughlin Aff. Ex. D) (Lin Dep. 34) Ms. Bass took down plaintiff's medical history and a description of the events of the day. (Loughlin Aff. Ex. D, p. 2) (Bass Dep. 15–22). During her interview, Ms. Bass noted Ms. Turturro's mood as anxious and frustrated, but she recommended that Ms. Turturro should be discharged. (Bass Dep. 15–22) According to the notes of Ms. Bass, plaintiff told her that she did not discover that her bag was missing until after she boarded the plane. (Loughlin Aff. Ex. D)

Based upon his personal observations of the demeanor of plaintiff, Dr. Lin deter-

mined that she should be held overnight for observation. (Lin Dep. 32) He concluded that Ms. Turturro was excitable, expressed grandiose ideations, and diagnosed her with bi-polar disorder. (Lin Dep. 29, 30) Dr. Lin also prescribed Ativan to aid her anxiety. (Loughlin Aff. Ex. D) (Lin Dep. 31) Plaintiff was displeased with this determination. At a later point, after Dr. Lin's departure, Ms. Bass contacted Dr. E.E. Edhomeriegue, referred to by the witnesses and in hospital records as Dr. Edos, and reviewed the facts with him over the telephone. (Bass Dep. 33–34) Dr. Edos concluded that it was not necessary for plaintiff to be further evaluated and allowed her to be discharged from the hospital with instructions to follow up with her private physician in New York City. (Loughlin Aff. Ex. D, p. 4) (Edos Dep. 10, 13–21) Plaintiff was released from the hospital at 11:30 p.m., although she reports that she remained until her fiancé arrived at 1:00 a.m. (Bass Dep. 35) (P.Auth. Cmplt. ¶ 28)

There is no evidence that the Port Authority police officers remained at the hospital during the evaluation or had any input in the information relayed to Drs. Lin or Edos. There is also no evidence that the Hospital Defendants conferred with any employee of the Port Authority either before Dr. Lin made the initial decision to hold plaintiff for observation or Dr. Edos made the determination to release plaintiff. Dr. Lin stated he did not speak to anyone from the Port Authority that night. (Lin Dep. 85)

## III. *Standard for Summary Judgment*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Thus, it is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in his favor, as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In the absence of any disputed material fact, summary judgment is appropriate.

IV. *The Complaints*

The Second Amended Complaint, the operative pleading against the Port Au-

thority Defendants, asserted, among others, state law claims in defamation, intentional infliction of emotional harm and discrimination, *i.e.* that she was "unlawfully discriminated against ... due to her mental condition." (P.Auth. Cmplt. ¶¶ 48–57) By letter dated June 8, 2004, counsel for plaintiff advised that these claims have been withdrawn and what remains against the Port Authority Defendants is a claim brought under both sections 1983 and 1985 and a state law claim for false imprisonment.

The Complaint against the Hospital Defendants originally asserted a claim for infliction of emotional distress. (Hosp. Cmplt. ¶¶ 38–41) Plaintiff's counsel advised in his June 8 letter that this claim has been withdrawn. There remains a claim asserted under both sections 1983 and 1985 and state law claims of false imprisonment, negligence and malpractice.

I will first address so much of the claims as are brought under section 1983, analyzing it for each group of defendants, and then the section 1985 claim as against all defendants.

V. *Section 1983 Claim against the Port Authority and its Officers*

■ Section 1983 provides, in relevant part, that "[e]very person who, under color of [state law] subjects, or causes to be subjected, any ... person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law" or a "suit in equity." In order to establish liability under a section 1983 claim, the plaintiff must satisfy two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statuto-

ry rights, or her constitutional rights or privileges. *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998).

### A. The Liability of the Port Authority

■ The Port Authority was established in 1921 pursuant to a state compact between New York and New Jersey and assented to by Congress. *See Baron v. Port Authority of New York and New Jersey,* 271 F.3d 81, 83 (2d Cir.2001), *citing* N.Y. Unconsol. Law § 6407 (McKinney 2000) and U.S. Stat. 174 (1921). It is not a state agency for purposes of Eleventh Amendment immunity. *See Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994); *Emblen v. Port Authority,* 2002 WL 498634, at *4 (S.D.N.Y. Mar. 29, 2002). However, when its agents act in a law enforcement capacity, they act under "color of law". *See Raysor v. Port Authority of New York and New Jersey,* 768 F.2d 34, 40 (2d Cir.1985); *see also Brady v. Port Authority of New York and New Jersey,* 1998 WL 724061 (E.D.N.Y. Oct. 15, 1998) (actions in the Port Authority's capacity as an employer are under "color of law"). In order to hold the Port Authority liable under section 1983, the deprivation of rights must generally be pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Servs. of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). *See Raysor,* 768 F.2d at 38; *Emblem,* 2002 WL 498634, at *4 (a *de jure* enactment). In addition to an express policy or enacted law or regulation, a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law.' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). *Emblem,* 2002 WL 498634, at *4 (a *de facto* custom). High-ranking officials who have "final policymaking authority" may by their actions subject the government to liability under section 1983. *City of St. Louis,* 485 U.S. at 123, 108 S.Ct. at 924. That said, the doctrine of *respondent superior* has no application under section 1983. *Id.,* 485 U.S. at 121–122, 108 S.Ct. at 923.[2] To quote the succinct summary by Judge Schwartz in a suit against the Port Authority, the entity "may be held liable under 1983 in the case of (1) de jure enactment; (2) de facto custom; or (3) acts of high-ranking officials." *Emblem,* 2002 WL 498634, at *4.

■ Here, the plaintiff woefully falls short of alleging a claim against the Port Authority under section 1983. The pleading purports to state a claim against the governmental entity but simply lumps it in with its two officers and claims that they all acted under color of law (P. Auth. Cmplt. ¶¶ 40–44), a point they do not dispute. The pleading states no cognizable claim against the Port Authority and the plaintiff has had more than ample opportunity to conduct discovery and assert facts in support of a claim. Summary judgment dismissing the section 1983 claim against the Port Authority is granted.

### B. Section 1983 Claim Against Sergeant Licorish and Officer Brown

■ The two officer defendants move for summary judgment on the section 1983 claim under the doctrine of qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to

---

**2.** As *Raysor* notes, the issue of whether an analogue state law claim may be premised upon *respondeat superior* is a different matter. 768 F.2d at 38.

liability ... effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz,* 533 U.S. 194, 200–201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). Thus, "[w]here the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.,* 533 U.S. at 200, 121 S.Ct. at 2156; *see Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (per curiam). If such immunity applies, a dismissal of the plaintiff's claim, as a matter of law, is required.

In *Saucier,* the Supreme Court developed a two-part inquiry to evaluate qualified immunity claims in civil rights actions. The initial inquiry in the *Saucier* analysis is whether the facts taken in the light most favorable to the party asserting the injury show the officer's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 at 2156, 150 L.Ed.2d 272. The inquiry in this case is whether the actions of the two Port Authority officers violated the plaintiff's Fourth Amendment right to be free from unreasonable "seizure" of a person without probable cause. Reasonable mistakes of fact as to the necessity of the officers' actions are considered at this point in the analysis. *Stephenson v. Doe,* 332 F.3d 68, 78 (2d Cir. 2003). If no constitutional right is violated, then there is "no necessity for further inquiries concerning qualified immunity" and the defendants are granted qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156.

If a constitutional violation is shown, then the Court must look to the second prong of a qualified immunity analysis and "ask whether the right was clearly established." *Id.* In deciding if a right is clearly established, the pertinent inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.,* 533 U.S. at 202, 121 S.Ct. at 2156. In order for a reasonable officer to recognize his conduct as unlawful, the law needs to first put him on notice that this particular conduct is unlawful. *Id.* This second part to the *Saucier* analysis recognizes "that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.,* 533 U.S. at 205, 121 S.Ct. at 2158. If the officer's mistake as to the legal constraints of his actions is reasonable, then the qualified immunity defense is still appropriate.

■ "Police decisions to seize a person are evaluated under the Fourth Amendment's reasonableness standard." *Kerman v. City of New York,* 261 F.3d 229, 237 (2d Cir.2001) (*"Kerman I"*). In *Kerman I,* the Court had occasion to address the standard governing a police seizure because of an individual's mental condition: "[a]n officer's decision to ... detain a person will not violate the Constitution so long as the officer had probable cause to believe that the person presented a risk of harm to himself or others." *Id.* See also *Kerman v. City of New York,* 374 F.3d 93 (2d Cir.2004)(*"Kerman II"*).

■ When determining if there is probable cause to seizure of a person, courts must look to the "totality of the circumstances". *Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983); *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994). Courts must also be aware that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. An assessment of probable cause "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second

decision." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir.1996).

In this case, defendants have failed to come forward with affidavits or deposition testimony of the two officers. Thus, I am left to guess what, if anything, they were told about Ms. Turturro's conduct on board the aircraft. Were the officers informed by the flight crew of her demeanor on board the aircraft? Were they aware of sweating, shaking and a panicked voice? Were they told that, after the plane departed the gate, she had used her cell phone? Did they know that the aircraft had departed the gate but returned by reason of her conducts and statements, thereby increasing the risk of injury to other passengers by reason of the needless movement of a massive aircraft on the tarmac or runway? Did they know that she placed a call to 911 claiming to be a hostage, thereby implying that she was being held against her will until some condition of her captors was met? The concept of qualified immunity focuses on the lawfulness and reasonableness of the conduct of the party claiming the immunity, based upon their knowledge and reasonable beliefs at the time. *See, e.g. Cowan v. Breen*, 352 F.3d 756, 764–765 (2d Cir.2003); *Salim*, 93 F.3d at 92. I will deny the officer defendants' motion for summary judgment on qualified immunity grounds but allow them to renew their motion setting forth their knowledge and reasonable beliefs at the time they detained the plaintiff. At that juncture, the officer defendants may brief the application of *Kermit I* to the facts of which they were then aware.

VI. *Section 1983 Claim Against The Hospital Defendants*

■ As noted earlier, in order to establish liability under section 1983, the plaintiff must satisfy two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. *Annis*, 136 F.3d at 245.

■ The Hospital Defendants argue that plaintiff failed to establish the first element of a section 1983 claim because there is no evidence that they were acting "under color of state law." To establish action under color of state law, the defendant's actions must be "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quotations omitted).

■ Plaintiff asserts that the Hospital Defendants acted under color of state law because they acted in concert with state agents, *i.e.*, employees of the Port Authority. (Hosp.Cmplt. ¶ 33) A private actor may act under color of state law if it is "a willful participant in joint activity with the State or its agents." *U.S. v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966). The Supreme Court has set forth three tests in order to determine if private action represents state action for the purposes of a section 1983 claim. As summarized in *Okunieff v. Rosenberg*, 996 F.Supp. 343, 347–57 (S.D.N.Y.1998), *aff'd*, 166 F.3d 507 (2d Cir.1999)(per curiam), *cert. denied*, 528 U.S. 1144, 120 S.Ct. 1002, 145 L.Ed.2d 945 (2000), a private activity is deemed state action: (1) when there is a "close nexus" between the private and state actors, (2) when the private activity is a product of "state compulsion," or (3) when the private activity is a public function.[3]

---

**3.** The Second Circuit affirmed Judge Sweet in *Okunieff* "for substantially the reasons set

The plaintiff points to no state statute or regulation that promotes or induces involuntary commitment by the hospital. Ms. Turturro asserts that the Hospital Defendants acted "in concert" and "conspire[d]" with the Port Authority because they detained her "based on information received by the Hospital [D]efendants from the Port Authority police." (Letter of Paul A. Shneyer, June 8, 2004) Using all three tests employed in *Okunieff,* plaintiff has failed to raise a genuine dispute of fact that the Hospital Defendants actions are deemed state action for purposes of section 1983.

### A. *The State Compulsion Test*

 In order to satisfy the "state compulsion test," the plaintiff must show the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Okunieff,* 996 F.Supp. at 348–349 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). To find "[s]tate action through state compulsion requires actual coercion by a state actor that impacts upon the private physician's decision-making." *Doe v. Harrison,* 254 F.Supp.2d. 338, 342 (S.D.N.Y.2003).

Plaintiff fails to meet the requirements of the state compulsion test because there is no showing of persuasion or inducement over the Hospital Defendants by the Port Authority Defendants. While the officers who transported plaintiff were indisputably state actors, neither the Hospital nor the intake personnel employed by the Hospital became state actors simply because they received information from the transporting officers. It was ultimately the decision of the Hospital, with the doctor's opinion holding the most weight, to hold

plaintiff rather than discharge her. (Bass Dep. 9, 10, 30) Dr. Lin, the doctor who made the decision not to immediately discharge the plaintiff, never spoke to either of the Port Authority officers. (Lin Dep. 85) He chose to take the cautious approach of holding plaintiff for further observation, after he personally examined her and diagnosed her with a bi-polar disorder. (Lin Dep. 30, 32) The question is not whether the diagnosis was correct but rather whether Dr. Lin's actions were under color of state law. Because Dr. Lin neither spoke to Port Authority employees, nor based his evaluation of Ms. Turturro on information provided by the Port Authority, the plaintiff cannot base her claim on state compulsion of the Hospital Defendants by a governmental entity.

### B. *The "Close Nexus" Test*

Under the "close nexus" test, the plaintiff must show "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Okunieff,* 996 F.Supp. at 349 (*quoting Blum,* 457 U.S. at 1004, 102 S.Ct at 2786). The intention of the close nexus requirement is to "assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Id.*

 The plaintiff points to no state statute or regulation that could provide a close nexus between the Hospital Defendants and either the Port Authority or the State of New Jersey. While the Hospital Defendants are licensed and regulated by the State of New Jersey, this alone is not enough of a relationship to turn their private actions into actions of the state. The Supreme Court has held that "the mere

forth in the district court's comprehensive and scholarly opinion." 166 F.3d at 507.

fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); *see Blum*, 457 U.S. at 1008, 102 S.Ct. at 2788 (a state regulation requiring physicians to prepare a nursing home patient discharge plan and complete a form does not convert the discharge decision into action by the state); *Schlein v. Milford Hosp.*, 561 F.2d 427, 428 (2d Cir.1977) ("The mere fact that [the State] regulates the facilities and standards of care of private hospitals does not per se make the acts of the hospital ... the acts of the state. Such a blanket rule would overlook the essential point that ... the state action, not the private action, must be the subject of the complaint").

The close nexus test can also be met if it involves a situation in which the State has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Okunieff*, 996 F.Supp. at 352 (quotations omitted). As stated earlier, there is no evidence that the Port Authority officers had any input or played any role in the decision to involuntarily hold Ms. Turturro for further observation. The fact that they told hospital officials what happened when they dropped her off at the hospital is not enough to show concerted or joint action. Ms. Turturro's allegation of concerted action is vague and conclusory, and the Second Circuit has held that "[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. County of Nassau*, 292 F.3d 307,

324 (2d Cir.2002). For these reasons, the Hospital Defendants actions do not meet the close nexus test.

### C. *The Public Function Test*

■ The actions of the Hospital Defendants do not meet the public function test. In order for a private entity's action to be considered state action under the public function test, the plaintiff must show that the private party utilized powers "traditionally the exclusive prerogative of the State." *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418, (1982) (quoting *Jackson*, 419 U.S. at 353, 95 S.Ct. at 454). The district court in *Okunieff*, affirmed by the Second Circuit, held that the fact that a "private party had powers coextensive with the state is irrelevant to determine that state action exists. Exclusivity is required." *Okunieff*, 996 F.Supp. at 353. The standard to declare a function to belong exclusively to the state is strict, and "an extraordinarily low number of ... functions have been held to be ... 'public'." *Doe v. Harrison*, 254 F.Supp.2d 338, 343 (S.D.N.Y.2003) (quotations omitted).

Ms. Turturro has failed to cite any law, regulation or evidence that the power to direct a patient to remain briefly for further psychiatric evaluation is a power that may be exercised exclusively by the State and not by a physician employed by a private hospital.[4] In *Schlein*, 561 F.2d at 429, the Second Circuit discussed the actions of a private hospital in general terms, and held that although acts of a private hospital "are clearly affected with a public interest, the functions performed by it have not been traditionally associated with

---

4. Ms. Turturro insisted that she be permitted to leave the hospital and her protestations led to the discharge decision by Dr. Edos. Approximately three hour elapsed from the time of Ms. Turturro's arrival to the time of discharge from the emergency room. (Loughlin Aff. Ex. D) As noted, there is no evidence that the state actors—the two officers—remained during this period.

sovereignty, and have long been relegated to the private domain, rather than treated as traditionally the exclusive prerogative of the State." (internal citations and quotations omitted). In that case, the Court concluded that the private hospital's activities were not "so clearly governmental in nature" as to amount to a "public function." *Id.* (quoting *Barrett v. United Hospital,* 376 F.Supp. 791, 803 (S.D.N.Y.1974), *aff'd,* 506 F.2d 1395 (2d Cir.1974)).

In summary, the Hospital Defendants have come forward with evidence that they did not act under color of law and were not a state actor relative to Ms. Turturro. Plaintiff failed to come forward with evidence to raise a triable issue of fact. Accordingly, the Hospital Defendants are entitled to summary judgment dismissing the claim under section 1983.

### VII. *Plaintiff's Claims Under Section 1985 Against All Defendants*

In each of the two complaints, plaintiff invokes 42 U.S.C. § 1985 along with section 1983 in a single claim. (P.Auth. Cmplt. ¶¶ 40–44; Hosp. Cmplt. ¶¶ 30–34) To state a claim under section 1985, plaintiff must allege four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters and Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983). A plaintiff must allege more than conclusory or vague allegations of a conspiracy to state a claim under section 1985. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999); *see also Roffman v.*

*City of New York,* 2002 WL 31760245 at *6 (S.D.N.Y. Dec. 10, 2002). To support a claim for conspiracy under section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003) (quoting *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000)).

Ms. Turturro alleged that "[d]efendants Naeemah Brown, Darcy Licorish, 'John Does' and Port Authority conspired to falsely imprison and detain plaintiff," and "conspired to deprive" her of her civil, constitutional, and statutory rights. (P.Auth. Cmplt. ¶¶ 41–42) She also alleges that Ms. Turturro alleged that the Hospital Defendants were liable under section 1985 because while "acting in concert with agents and employees of the Port Authority Police," they "conspired to falsely imprison and detain plaintiff," thereby depriving her of her constitutional and statutory rights. (Hosp.Cmplt. ¶¶ 31–32) As to these claims of concerted action and conspiracy, Ms. Turturro did not allege any specific facts supporting these allegations either in her complaint, or in her papers in opposition to defendants' motion for summary judgment. There were no facts provided demonstrating any type of agreement or meeting of the minds to engage in unlawful conduct between any of the defendants in this action. The Second Circuit has stated, "a complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). *See also Gyadu,* 197 F.3d at 591 (holding that a vague allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Because Ms. Turturro's allegations are too conclusory and vague to

support a claim for civil conspiracy under section 1985, this court dismisses the plaintiffs' claims under section 1985 against all defendants.

## VIII. *Plaintiff's Pendent State Claims Against the Hospital Defendants*

A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C.A. § 1367(a), which provides in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c) provides that a district court "may" decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C.A. § 1367(c)(3).

The Second Circuit has held that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir.2003); *see also Travelers Ins. Co. v. Keeling*, 996 F.2d 1485, 1490 (2d Cir.1993) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988)). The balance of factors to be considered includes judicial economy, convenience, fairness and comity. *Valencia*, 316 F.3d at 305.

Because this Court has dismissed all federal causes of action under sections 1983 and 1985 against the Hospital Defendants, the court declines to exercise supplemental jurisdiction over the state law causes of action of false imprisonment, negligence, and malpractice. I do so because the claims in part turn on potentially novel issues of New Jersey State Law. The defenses to the claims of false imprisonment, negligence and malpractice involve the application of New Jersey State statutes embodying the public policy of that state. The Hospital Defendants invoke N.J.S.A. 30:40–27.7 which provides immunity for certain persons "who take reasonable steps to assess, take custody of, [or] detain ... an individual for the purposes of mental health assessment...." They also invoke a statute that requires an affidavit of merit from a licensed person in the particular field to be filed within 60 days of the commencement of an action for malpractice or professional negligence. N.J.S.A. 2A:53A 27. While district courts are capable and are bound to apply the state law to claims, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650, 670 (W.D.N.Y. 2003). Judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over the remaining state law claims against the Hospital Defendants and, accordingly, they are dismissed.

## *Conclusion*

The Orders of August 26, 2003 and October 14, 2003 are vacated insofar as they consolidated *Turturro v. Trinitas Hospital, et al.*, 02 Civ 0576(PKC) with *Turturro v. Port Authority of New York and New Jersey, et al.*, 00 Civ. 8870(PKC) and *Turturro v. Continental Airlines, et al.*, 00 Civ. 0637(PKC). *Turturro v. Trinitas Hospital, et al.*, 02 Civ 0576(PKC) is reopened as a separate action.

The motion for summary judgment seeking dismissal of all claims against defendants Trinitas Hospital, Elizabeth Medical Center and Dr. C.L. Lin is GRANTED in its entirety. Judgment should enter in favor of Trinitas Hospital, Elizabeth Medical Center and Dr. C.L. Lin.

The motion for summary judgment of the Port Authority is GRANTED insofar as all federal claims against it are dismissed. The motion for summary judgment by defendants Licorish and Brown in relation to plaintiff's section 1985 claims is GRANTED; the motion is otherwise DENIED without prejudice.

Defendants Licorish and Brown may renew their motions on or before September 20, 2004, upon a proper showing of their knowledge and reasonable belief at the time of the detention. If they succeed on their qualified immunity motion, I will assess, based upon the arguments advanced heretofore, whether the exercise of supplemental jurisdiction is appropriate over the remaining state law claims against defendants Port Authority, Licorish and Brown. *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir.2003). If the officer defendants' motion is denied (or no motion is filed by September 20), then I will set a further briefing schedule for the remaining defendants' other grounds for dismissal of the state law claims.

SO ORDERED.